STATE OF NORTH CAROLINA v. GREGORY HUDSON JONES

No. 40

(Filed 17 April 1978)

1. Criminal Law § 78— admission of evidence—tender of stipulation

A party cannot control the admission of competent evidence by tendering stipulations deemed to be less damaging to his cause than the live testimony of the witness himself.

2. Criminal Law § 46.1— shooting of officer during flight—admissibility—offer to stipulate shooting details

Testimony by a highway patrolman that defendant shot him numerous times when he stopped defendant for speeding on the morning after commission of some of the crimes for which defendant was on trial at a point 110 miles from the crime scene was competent to show flight by defendant even though the testimony disclosed defendant's commission of a separate and distinct offense. Furthermore, the patrolman's testimony was not rendered inadmissible by defendant's offer to stipulate that when he was stopped for speeding, he shot the patrolman five times in the chest and once in the head, that he got out of his car and shot the patrolman two more times in the head, and that he continued to flee and was later apprehended.

3. Homicide § 24.3— self-defense—instructions on burden of proof

The charge of the court, when considered as a whole, unmistakably placed the burden of proof upon the State to satisfy the jury beyond a reasonable doubt that defendant did not act in self-defense in a murder and three felonious assaults, although isolated portions of the charge may have been subject to the interpretation that defendant had the burden of proving self-defense to the satisfaction of the jury.

4. Criminal Law § 138.11— more severe sentences on retrial—cumulative sentences less on retrial

Where defendant received more severe sentences upon three of the seven charges of which he was convicted after a retrial, but the record contains no reasons and no factual data for the increased sentences, the increased portions of the three sentences must be set aside, notwithstanding the totality of defendant's cumulative sentences after the second trial is substantially less than the totality of his sentences at his first trial.

5. Kidnapping § 1.2— no variance between indictment and proof

Defendant's contention that there was a fatal variance between indictment and proof because the indictment charged a kidnapping on 9 October for the purpose of facilitating an assault, burglary and murder and the evidence showed that defendant committed the assault, burglary and murder on 16 October is without merit where the evidence also showed that defendant committed a second degree burglary shortly after the victim was taken captive and removed from one place to another on 9 October.

State v. Jones

6. **Criminal Law § 76.2— in-custody statement—no confession or inculpatory statement—voir dire not required**

The trial judge was not required to conduct a voir dire hearing before ruling on the admissibility of defendant's in-custody statement that "they beat the hell out of me when they arrested me" since the statement contained no acknowledgment of defendant's guilt of any of the charges against him or of any essential element thereof and was not a confession or inculpatory statement.

7. **Criminal Law § 86.6— in-custody statement—impeachment of testimony and written statement**

Where defendant's testimony in his trial for murder and two felonious assaults and a written statement defendant gave to officers both strongly indicated that bruises and cuts on his body and face were inflicted by the victims in a murderous assault upon him and that he shot the victims in self-defense, defendant's prior inconsistent statement to an officer that the cuts and bruises were received because "they beat the hell out of me when they arrested me" was competent to impeach his trial testimony and written statement.

DEFENDANT appeals from judgments of *Rouse, J.*, 15 August 1977 Session, NEW HANOVER Superior Court.

This is defendant's second appeal. He was initially convicted in 1976 and on appeal, granted a new trial. See 292 N.C. 513, 234 S.E. 2d 555 (1977).

Defendant was tried upon eight separate bills of indictment, consolidated for trial. The charges, the verdicts, and the sentences imposed are as follows:

1. Case No. 15634—first degree murder of Peter Fearing on 16 October 1975. Defendant was convicted on this charge and sentenced to life imprisonment. (At his first trial he was sentenced to death.)

2. Case No. 15635—first degree burglary of the dwelling house of Mrs. Donna Rowe (mother of Peter Fearing) on 16 October 1975. Defendant was convicted of first degree burglary and sentenced to life imprisonment, to run concurrently with the life sentence imposed in Case No. 15634. (At his first trial he was sentenced to life imprisonment to commence at the expiration of the death sentence in Case No. 15634.)

3. Case No. 15633—kidnapping Ronald Lee Elkins on 9 October 1975 for the purpose of facilitating the commission of the

felonies of assault with a deadly weapon inflicting serious injury, burglary and murder. Defendant was convicted of kidnapping and sentenced to 20-25 years to commence at the expiration of the life sentence imposed in Case No. 15635. (At his first trial he was sentenced to 20 years to commence at the expiration of the life sentence pronounced in Case No. 15635.)

4. Case No. 15636 — assault with a deadly weapon with intent to kill inflicting serious injuries upon Ronald Elkins on 16 October 1975. Defendant was convicted as charged and sentenced to 19-20 years, to commence at the expiration of the life sentence pronounced in Case No. 15634. (At his first trial he was sentenced to 18-20 years to commence at the expiration of the 20-year sentence for kidnapping imposed at that time in Case No. 15633.)

5. Case No. 15637 — assault with a deadly weapon with intent to kill inflicting serious injuries upon Brian Jones on 16 October 1975. Defendant was convicted of assault with a deadly weapon inflicting serious injury and sentenced to 9-10 years to commence at the expiration of the sentence imposed in Case No. 15636. (At his first trial he was sentenced to 8-10 years to commence at the expiration of the sentence imposed in Case No. 15640.)

6. Case No. 15639 — breaking or entering a motor vehicle (1966 Oldsmobile owned by Donna Davis Rowe which contained the goods and valuables of Peter Fearing valued at $40.00) with the intent to commit larceny therein. Defendant was convicted as charged and sentenced to 4-5 years to commence at the expiration of the sentence for kidnapping imposed in Case No. 15633. (At his first trial he was sentenced to 4-5 years to commence at the expiration of the sentence imposed in Case No. 15637.)

7. Case No. 15638 — felonious breaking and entering the residence of Marvin and Diane Herring with intent to commit felony larceny and larceny of property valued at more than $200. Defendant was convicted of non-felonious breaking or entering and misdemeanor larceny and sentenced to two years to run concurrently with the life sentence imposed in Case No. 15634. (At his first trial he was sentenced to two years to commence at the expiration of a 4-5 year sentence in Case No. 15639.)

8. Case No. 15640 — assault with a deadly weapon with intent to kill inflicting serious injuries upon Clyde Melvin Herring on 9

October 1975. Defendant was acquitted on this charge. (At his first trial he was convicted of assault with a deadly weapon inflicting serious injury and sentenced to 8-10 years to commence at the expiration of a 18-20 year sentence in Case No. 15636.)

The State's evidence tends to show that on 8 October 1975 Ronald Elkins, age sixteen, and Peter Fearing, age nineteen, were hitchhiking and defendant picked them up in his light blue Volkswagen. The parties had never seen each other before that date. Elkins and Fearing had a joint of marijuana, and the three of them smoked it. Defendant inquired if the boys wanted to smoke some marijuana at his house and mentioned that he had some pot he wanted them to sell for him. They went to his house in Wilmington where they stayed for about an hour. Defendant gave Peter Fearing his phone number and then took the two boys home.

On 9 October 1975 Peter Fearing telephoned defendant and learned that he was going to the beach. Ronald Elkins, Peter Fearing and Butch Herring went to Wrightsville Beach that evening in Herring's car. In about fifteen minutes defendant arrived, took a little metal box containing marijuana from his blue Volkswagen, and walked to the beach with Peter Fearing. They were later joined by Butch Herring and Ronald Elkins. Defendant told Ronald Elkins privately that if anybody planned to "rip him off" he was going to collect "a little bit of interest." At defendant's invitation they all smoked two joints of marijuana while sitting on top of the dunes. It was dark at the time. Suddenly, Butch Herring yelled, "Look out, he's got a gun!" The gun fired, and Peter Fearing ran up the dunes with the box containing the marijuana but dropped it and ran away. Defendant pointed his gun at Elkins, cursed him, picked up the metal box, returned to his Volkswagen and left.

A short while later defendant saw Ronald Elkins walking across the bridge at Wrightsville Beach, drew his gun and ordered Elkins into the Volkswagen. He then drove back to the beach and forced Elkins to find defendant's flashlight which Elkins had attempted to steal. With Elkins as his captive, defendant drove to Butch Herring's parked car and forced Elkins to take a coat and some tapes from it and place them in defendant's Volkswagen. Defendant then drove to Peter Fearing's house, forc-

ing Elkins to show him the way. They parked and defendant forced Elkins to take a tape player and tapes, a speaker and some headphones out of Peter Fearing's car, a Coleman stove out of the garage, and put them in defendant's Volkswagen. Elkins was also forced to get some tires and place them in defendant's vehicle. Defendant then drove to Elkins' home at 1102 Browning Drive where he inspected the premises for things he might want to steal later. Defendant then told Elkins to take him to Butch Herring's house on Barnett Avenue, which he did. They knocked on the door, received no answer, opened the door and entered the Herring house, but found nobody home. The lights were turned on and defendant inspected the place. They left the house, drove down a road behind the courthouse, parked the Volkswagen, took a larger vehicle—an El Camino with pickup bed—and returned to the Herring house where defendant forced Elkins to take a stereo and tapes, a coffee table, a bar and bar stools, a black light bulb, and other articles and load them into defendant's vehicle. Defendant then drove to a spot on Market Street where he told Elkins to get out and consider himself lucky—that Elkins and Peter Fearing had better leave town because the next time defendant saw them he was going to kill them. Elkins jumped out, hitchhiked a ride, and arrived home about 4 a.m. on 10 October 1975.

Later the same morning, Elkins went to Peter Fearing's home, called the police, and he and Fearing told them what had happened the previous night.

On 15 October 1975 Elkins spent most of the day at Peter Fearing's home. That night they heard a noise in the back room that sounded like something had fallen, and they turned the lights off. Soon their friend Brian Jones arrived and joined them in the living room of the Fearing home. They then turned the lights on, and the three of them stood around smoking marijuana and playing music. Sometime after midnight a gun suddenly fired and Ronald Elkins was struck in the back by a bullet, which knocked him to the floor. Elkins turned his head and saw defendant in the hallway with gun in hand. No one knew defendant was in the house until that time. Elkins heard more shots in rapid succession. Defendant then shot Elkins in the head. After awhile Elkins arose and saw Peter Fearing lying between the sofa and the book shelves. Defendant was gone. Elkins stumbled to the house next door and someone there summoned the police and rescue squad.

Elkins was taken to the hospital where he spent seventeen days. Peter Fearing was taken to the hospital but died soon thereafter from a gunshot wound in his head.

The State's evidence further tends to show that after defendant shot Peter Fearing and Ronald Elkins, he shot Brian Jones in the leg, Jones fell, and defendant walked toward him, pointed the gun at Jones's head and pulled the trigger. The gun clicked but was out of ammunition. Defendant then ran away. Brian Jones was hospitalized for seven days.

Harry Stegall, a member of the State Highway Patrol, testified that on 17 October 1975 at approximately 8:15 a.m., he saw defendant driving west on U.S. 74 in an orange and red Volkswagen station wagon. At that time defendant was 110 miles from Wilmington and moving at 65 miles per hour in a 55-mile zone. Trooper Stegall pursued the vehicle and finally succeeded in stopping it. Defendant was the only occupant. Officer Stegall demanded and received defendant's operator's license, told him he had been clocked at 65 miles per hour in a 55-mile zone, and instructed defendant to follow him to Laurinburg to post bond. Defendant said nothing. As Trooper Stegall turned to go to his patrol car, defendant yelled "hey!" Defendant then raised a .380 automatic pistol and fired five shots into the officer's body. As the officer fell, defendant shot him in the side' of the face. Then defendant got out of the Volkswagen, ran to where the officer lay and fired two more shots—one in the shoulder and the other in the leg. Trooper Stegall "played dead." Defendant then took the officer's gun and drove away. The weapon was recovered when defendant was later captured.

Defendant testified in his own behalf. He said he was born in Virginia, attended high school and college in New Jersey, spent two years in the Army, and came to Wilmington to attend Cape Fear Technical Institute in the fall of 1975. He met Peter Fearing and Ronald Elkins on 8 October 1975 when he picked them up. They smoked marijuana together, listened to music at his house, and he took them home.

On 9 October 1975 defendant went scuba diving at Wrightsville Beach about sundown. When he came out of the water it was dark. He met Peter Fearing and Ronald Elkins near the jetty at Masonboro Inlet, and they helped him carry some of his diving gear to his Volkswagen. On the way they passed a vehi-

cle in which Butch Herring, whom defendant had never met, was seated. While defendant changed clothing, Peter Fearing talked privately to Butch Herring, then returned and said Butch wanted to meet defendant and suggested they all meet at the Surf Club. Defendant took his pistol with him because he had become suspicious of Butch Herring. He asked Ronald Elkins if they were going to rob him, and Elkins said they were not.

With Peter Fearing giving directions, they went up the beach to a building which Fearing said was the Surf Club. Then they walked down to the dunes where they were joined by Ronald Elkins and Butch Herring. While they were smoking pot, Butch suddenly yanked defendant completely off the ground with a tire tool wrapped around defendant's throat. Peter Fearing took defendant's house keys and car keys from his belt loop and ran toward the berm with defendant's metal box, a depth gauge and scuba watch. Ronald Elkins grabbed the diver's light. Defendant took his gun from his back pocket and shot Butch Herring, firing over his shoulder. Butch dropped the tire tool from defendant's throat and ran toward the beach. Peter Fearing dropped everything and kept running when defendant pointed the pistol at him. Ronald Elkins tried to run but fell on his face at which time defendant said, "I ought to shoot you."

Defendant gathered most of his things together, drove home and attended classes the following day. On returning home he found his television and couch were missing, and things were scattered all over the floor. While delivering an item to his next-door neighbor, he noticed police officers at his door. Thinking perhaps Butch Herring had died from his "over-the-shoulder" shot, he hid under the house until the officers left. He then hitch-hiked to Carolina Beach and from there to Atlanta to visit friends. He returned to Wilmington to find out why the police were after him and to get $600 he had in a Wilmington bank account.

When he got to his house in Wilmington, he found everything gone except some pots and pans, box springs and the bed. He assumed that Peter Fearing and Ronald Elkins had "ripped him off." He went to Peter Fearing's house around midnight on 15 October 1975, entered the garage, but failed to see any of his furniture. He heard voices inside, knocked, and Brian Jones opened

State v. Jones

the door. Peter Fearing was standing at the end of the couch and Ronald Elkins was in a chair near the stereo. Defendant had a .380 automatic in his pants pocket. Fearing and Elkins started cursing defendant. In the ensuing argument, defendant was kicked in the back by Brian Jones and fell to the floor. Peter then hit defendant in the face, and Elkins struck him with a large ashtray. Then all three began pounding and kicking defendant until his vision was blurred. Peter Fearing had a big knife—like a hunting knife—in his hand. Defendant shoved Fearing over the coffee table and saw Elkins coming at him again. At that point defendant took the pistol from his pocket and fired two rounds in Peter's direction. Brian Jones grabbed defendant by the throat, and Elkins tried to take the gun out of his hand. In the ensuing struggle the gun was fired four or five times. Elkins released his grip and fell to the floor. Defendant shot Brian Jones in the leg, went up the hall, reloaded his pistol, left the house through a window, and rode his motorcycle back to Carolina Beach.

Defendant further testified that he started hitchhiking toward Atlanta. The third ride he caught was with a man named "Denny" in a red Volkswagen. "Denny" requested defendant to drive. While driving down the highway, with Denny asleep in the back seat, he was stopped near Laurinburg by a highway patrolman. He thought the officer was stopping him for murder because he had heard on the radio that he was wanted for murder. The officer put his hand on his holster, and defendant thought he was going to be shot. He panicked and shot the officer. He did not intend to kill him but only to disarm him. After shooting Trooper Stegall, defendant drove a mile or two and abandoned the vehicle—just got out of the Volkswagen, leaving his baggage in it, and started walking through the woods. He was later apprehended and taken back to Wilmington.

Defendant offered several witnesses who testified to his good character.

Defendant appealed the life sentences directly to the Supreme Court, and we allowed motion to bypass the Court of Appeals in the remaining cases to the end that this Court provide initial appellate review in all cases.

*Rufus L. Edmisten, Attorney General, by James E. Magner, Jr., Assistant Attorney General, for the State.*

*G. H. Sperry, Attorney for defendant appellant.*

HUSKINS, Justice.

[1, 2]   Defendant contends the testimony of Patrolman Harry Stegall should have been excluded in that, by putting before the jury evidence of defendant's assault on Trooper Stegall, it showed defendant had committed a separate, distinct offense in violation of the rule discussed in *State v. McClain*, 240 N.C. 171, 81 S.E. 2d 364 (1954). Defendant argues that the State should have been required to accept a stipulation tendered by him to the effect that he fled New Hanover County and was apprehended by Officer Stegall for speeding; that he then shot the officer five times in the chest and once in the head; that he then got out of his car and shot the officer two more times in the head, after which he continued to flee and was later apprehended. Admission of Stegall's testimony and rejection of the stipulation constitutes defendant's first assignment of error.

The competency of Officer Stegall's testimony was fully discussed on defendant's first appeal. See *State v. Jones*, 292 N.C. 513, 234 S.E. 2d 555 (1977). The fact that the proffered stipulation at the second trial is more detailed than the stipulation tendered at the first trial is immaterial. The testimony of Officer Stegall was competent in the trial of these cases, and the prosecution was at liberty, at its option, to call the witness or accept and utilize the tendered stipulation. A party cannot control the admission of competent evidence by tendering stipulations deemed to be less damaging to his cause than the live testimony of the witness himself. *See, e.g., Alire v. United States*, 313 F. 2d 31 (10th Cir. 1962); *Parr v. United States*, 255 F. 2d 86 (5th Cir. 1958); *State v. Wilson*, 215 Kan. 28, 523 P. 2d 337 (1974); *State v. Cutshall*, 278 N.C. 334, 180 S.E. 2d 745 (1971); *Commonwealth v. Evans*, 465 Pa. 12, 348 A. 2d 92 (1975). As stressed in our first opinion, the degree or nature of the flight is of great importance to the jury in weighing its probative force and the evidence must be viewed in its entire context to be of aid to the jury in the resolution of the case. The testimony of Trooper Stegall was properly admitted, and defendant's first assignment is overruled.

[3]   Defendant's second assignment of error relates to the charge on self-defense. The court, while charging the jury with respect to the murder of Peter Fearing and the felonious assaults on Ronald Elkins and Brian Jones, charged, *inter alia*, as shown by the following excerpts:

1. "Now, members of the jury, under certain circumstances a killing may be excused. One of those circumstances is when the defendant is properly acting in his own self-defense. Thus, a killing would be excused entirely on the grounds of self-defense if, first, it appeared to the defendant and he believed it to be necessary to shoot Fearing in order to save himself from death or great bodily harm. (And second, the circumstances as they appeared to the defendant at the time were sufficient to create such a belief in the mind of a person of ordinary firmness.)"

DEFENDANT'S EXCEPTION NO. 91

\*     \*     \*     \*

2. "A person under law may not normally avail himself of self-defense when he has used deadly force to quell an assault by someone who has no deadly weapon, in other words, a simple assault within the law. However, if you are satisfied that because of the number of attackers or their size or the fierceness of the attack the defendant believed from the circumstances that he was in danger of death or suffering great bodily harm and that the belief was reasonable under the circumstances as they appeared to him at that time, and that the force was not excessive and that the defendant was not the aggressor (the defendant would have still satisfied you of self-defense and if you find that the defendant acted in self-defense, he would not be guilty).

DEFENDANT'S EXCEPTION NO. 92

"The burden is on the State to prove beyond a reasonable doubt that the defendant did not act in self-defense."

\*     \*     \*     \*

3. "That although you are satisfied beyond a reasonable doubt that the defendant did shoot Ronald Elkins with a pistol with or without the intent to kill Elkins and inflict serious injury, if you further find not beyond a reasonable doubt (but find to your satisfaction that at the time of the shooting [defendant] had reasonable grounds to believe and did believe that he was about to suffer death or serious bodi-

ly harm at the hands of Elkins or the combined hands of Fearing, Elkins and Brian Jones and under those circumstances he used only such force as reasonably appeared necessary, you, the jury, being the judge of such reasonableness, and you are also satisfied that the defendant was not the aggressor, then the shooting of Elkins would be justified by reason of self-defense and it would be your duty to return a verdict of not guilty upon the charge of felonious assault upon Ronald Elkins)."

DEFENDANT'S EXCEPTION NO. 98

\* \* \* \*

4. "Again, Members of the Jury, one of the contentions of the defendant is that in the shooting of Brian Jones, if you should find that he did shoot him, that he was acting in self-defense. (Again, I refer you to my previous instructions with respect to the law of self-defense.)"

DEFENDANT'S EXCEPTION NO. 99

"And again, I instruct you that the burden is upon the State to establish beyond a reasonable doubt that the defendant was not acting in self-defense at the time of the alleged shooting of Brian Jones.

"Thus, although you are satisfied beyond a reasonable doubt that the defendant did shoot Brian Jones with a pistol and inflicting serious injury, if you further find, not beyond a reasonable doubt but (find to your satisfaction that at the time of the shooting [defendant] had reasonable grounds to believe and did believe that he was about to suffer death or serious bodily harm at the hands of Brian Jones or the combined hands of Fearing, Elkins and Brian Jones and that under those circumstances he used only such force as reasonably appeared necessary, you, the jury, being the judge of such reasonableness and you are also satisfied that the defendant was not the aggressor, then the shooting of Brian Jones would be justified by reason of self-defense and it would be your duty to return a verdict of not guilty of the charge of felonious assault upon Brian Jones)."

DEFENDANT'S EXCEPTION NO. 100

The record discloses that after charging with respect to the alleged assault upon Ronald Elkins and Brian Jones, the court again told the jury that the burden was upon the State to establish beyond a reasonable doubt that the defendant was not acting in self-defense.

Finally, it is noted that after the jury had retired to deliberate, the judge recalled it and gave the following instruction:

"Members of the jury, I have previously charged you with respect to each of the self-defense instructions that I have given you, that the burden is upon the State to satisfy you that the defendant did not act in self-defense. I charge you further that the defendant does not have the burden of satisfying you that he acted in self-defense. And that instruction would apply to each of the self-defense situations that I have previously referred to in my instructions to you. Is that satisfactory Mr. Carriker and Mr. Sperry? — All right."

We think the jury clearly understood that the burden was upon the State to satisfy it beyond a reasonable doubt that defendant did not act in self-defense and clearly understood the circumstances under which it should return a verdict of not guilty by reason of self-defense. Many decisions of this Court hold that "a charge must be construed contextually, and isolated portions of it will not be held prejudicial when the charge as a whole is correct." *State v. Gaines*, 283 N.C. 33, 194 S.E. 2d 839 (1973); *State v. Cook*, 263 N.C. 730, 140 S.E. 2d 305 (1965). Where the charge as a whole presents the law fairly and clearly to the jury, the fact that isolated expressions, standing alone, might be considered erroneous affords no grounds for a reversal. *State v. Hall*, 267 N.C. 90, 147 S.E. 2d 548 (1966). *Accord, State v. McWilliams*, 277 N.C. 680, 178 S.E. 2d 476 (1971). Technical errors which are not substantial and which could not have affected the result will not be held prejudicial. *State v. Gatling*, 275 N.C. 625, 170 S.E. 2d 593 (1969); *State v. Norris*, 242 N.C. 47, 86 S.E. 2d 916 (1955). So it is here. The isolated expressions of the judge, shown in parentheses in the quoted portions of the charge, may not be detached from the charge as a whole and critically examined for an interpretation from which prejudice to defendant may be inferred. *State v. Gatling, supra; State v. Jones*, 67 N.C. 285 (1872).

We hold that the trial court unmistakably placed the burden of proof upon the State to satisfy the jury beyond a reasonable doubt that defendant did not act in self-defense in the murder of Peter Fearing and in the assaults upon Ronald Elkins, Brian Jones and Butch Herring. In fact, the jury acquitted defendant with respect to the alleged felonious assault on Butch Herring, a verdict obviously grounded on a finding that defendant, while being choked with a tire tool by Butch Herring, shot Herring in self-defense and did not use excessive force in doing so. Considered as a whole, the court's charge on self-defense meets the requirements of *Mullaney v. Wilbur*, 421 U.S. 684, 44 L.Ed. 2d 508, 95 S.Ct. 1881 (1975), and *State v. Hankerson*, 288 N.C. 632, 220 S.E. 2d 575, *rev'd on other grounds* 432 U.S. 233, 53 L.Ed. 2d 306, 97 S.Ct. 2339 (1977). Defendant's second assignment of error is overruled.

It is appropriate at this juncture, however, to point out that *State v. Dooley*, 285 N.C. 158, 203 S.E. 2d 815 (1974), was decided prior to *Mullaney v. Wilbur*, supra, and at a time when an accused pleading self-defense had the burden of satisfying the jury—not beyond a reasonable doubt or by a preponderance of the evidence, but simply to satisfy the jury—that he acted in self-defense. Consequently, the approved form of instruction on self-defense appearing in *Dooley* at page 166, although still sound as a statement of the constituent elements of self-defense, should be restated in post-*Mullaney* language.

[4] Defendant next contends the trial court erred in pronouncing more severe sentences upon his reconviction for kidnapping (Case No. 15633), felonious assault upon Ronald Elkins (Case No. 15636), and felonious assault upon Brian Jones (Case No. 15637) without setting out in the record the reasons for the increased sentences as required under *North Carolina v. Pearce*, 395 U.S. 711, 23 L.Ed. 2d 656, 89 S.Ct. 2072 (1969). Defendant's third, fourth and fifth assignments of error are grounded on this contention.

In Case No. 15633, the kidnapping case, defendant was sentenced to 20 years at his first trial and to 20-25 years at his second trial. In Case No. 15636 involving a felonious assault upon Ronald Elkins, at his first trial defendant was sentenced to 18-20 years to commence at the expiration of the 20-year sentence for kidnapping. Upon his second conviction he was sentenced to 19-20

State v. Jones

years to commence at the expiration of a life sentence in Case No. 15634. In Case No. 15637 involving a felonious assault upon Brian Jones, defendant was sentenced to 8-10 years at his first trial and to 9-10 years at his second trial to commence at the expiration of the sentence imposed in Case No. 15636.

In *North Carolina v. Pearce*, supra, defendant was convicted of an assault with intent to commit rape and sentenced to a term of 12-15 years. Several years later in a post conviction proceeding, his conviction was reversed by the Supreme Court of North Carolina on the ground that an involuntary confession had been unconstitutionally admitted into evidence against him. See *State v. Pearce*, 266 N.C. 234, 145 S.E. 2d 918 (1966). Pearce was retried, convicted, and sentenced to a term of eight years which, when added to the time already served, amounted to a longer total sentence than that originally imposed. The conviction and sentence were upheld on appeal, *State v. Pearce*, 268 N.C. 707, 151 S.E. 2d 571 (1966). Pearce then commenced a habeas corpus proceeding in the United States District Court, and that Court held the longer sentence imposed on retrial "unconstitutional and void." That order was affirmed by the Fourth Circuit, 397 F. 2d 253 (1968). On certiorari, the United States Supreme Court affirmed, holding, *inter alia*: (1) Punishment already exacted must be fully credited in imposing sentence upon a new conviction for the same offense; (2) neither the Equal Protection Clause of the Fourteenth Amendment nor the Double Jeopardy Clause of the Fifth Amendment imposes an absolute bar to a more severe sentence upon reconviction; (3) the Due Process Clause of the Fourteenth Amendment proscribes vindictiveness upon retrial against a defendant for having successfully upset his first conviction; and (4) to assure the absence of vindictive motivation when a judge imposes a more severe sentence after a new trial, the reasons for the more severe sentence must affirmatively appear of record, and the factual data upon which the increased sentence is based must be made part of the record, to the end that the constitutionality of the increased sentence may be reviewed.

Since the record before us contains no reasons and no factual data for the increased sentences here under attack, we hold that defendant's third, fourth and fifth assignments of error are well taken and must be sustained. Even so, the minimal increases in each of the three cases involved demonstrate inadvertance and

negate vindictiveness on the part of the conscientious trial judge who presided at defendant's second trial. In fact, as argued by the prosecution, the totality of defendant's cumulative sentences after the second trial is substantially less than the totality of his sentences at his first trial. Nevertheless, we hold the constitutional tests fashioned in *Pearce* must be applied separately — not collectively — to the sentence imposed in each case. Accordingly, the *excessive portions* of the sentences pronounced in Case Nos. 15633, 15636 and 15637 cannot stand.

[5] Denial of defendant's motion to dismiss the kidnapping charge constitutes his sixth assignment of error.

The bill of indictment upon which defendant was tried alleges he kidnapped Ronald Lee Elkins on 9 October 1975 "for the purpose of facilitating the commission of the felonies of assault with a deadly weapon inflicting serious bodily injury and burglary and murder." Defendant argues that any assault, burglary or murder committed by him occurred on 16 October 1975 and that, considering the evidence in the light most favorable to the State, it has not been shown that defendant took Elkins on 9 October 1975 to facilitate any assault, burglary or murder on 16 October 1975. Therefore, defendant argues, there is a fatal variance between the allegation and the proof.

For reasons which follow, this assignment has no merit:

To warrant a conviction for burglary it must be shown that there was a breaking and entering during the nighttime of a dwelling or sleeping apartment with intent to commit a felony therein. *State v. Mumford*, 227 N.C. 132, 41 S.E. 2d 201 (1947). "Since 1889, burglary has been divided into two degrees by G.S. 14-51. If the burglarized dwelling is occupied, it is burglary in the first degree; if unoccupied, it is burglary in the second degree. [Citations omitted.] To constitute burglary in either degree, however, the common law required the felonious breaking and entering to occur in the nighttime, *State v. Whit*, 49 N.C. 349 (1857); and this common law requirement is still the law in North Carolina. G.S. 4-1." *State v. Cox*, 281 N.C. 131, 134-35, 187 S.E. 2d 785, 787 (1972).

Ronald Elkins testified that defendant took him captive at gunpoint and, after stealing various items at Peter Fearing's

house, directed Elkins to take him to Butch Herring's house on Barnett Avenue. There, at defendant's direction, Elkins opened the door and both of them went into the Herring house but found nobody home. After inspecting the place they left to exchange defendant's Volkswagen for a larger vehicle, returned to the Herring house, again opened the door and went inside. At that time numerous items of personal property were stolen, placed in defendant's vehicle, and carried away by him. This constituted burglary in the second degree, *State v. Cox*, supra, and was committed shortly after Ronald Elkins was unlawfully taken captive and removed from one place to another on the night of 9 October 1975.

G.S. 14-39(a), effective 1 July 1975, provides, in pertinent part, that any person who unlawfully confines, restrains or removes from one place to another, any other person 16 years of age or over, without the consent of such person, for the purpose of facilitating the commission of any felony shall be guilty of kidnapping. Burglary in the second degree is a felony. Therefore, defendant committed the crime of kidnapping, as defined in G.S. 14-39(a), on the night of 9 October 1975. It thus becomes unnecessary to discuss or decide the question whether the murder of Peter Fearing or the felonious assaults upon Ronald Lee Elkins and Brian Jones on the night of 16 October 1975 may legally constitute the "purpose," within the meaning of G.S. 14-39(a), for which Elkins was taken captive seven days earlier. The bill of indictment alleges that Elkins was taken for the purpose of facilitating the commission of the felony of burglary, and evidence to sustain that allegation shows that defendant committed a burglary on both 9 and 16 October. There is no fatal variance between the allegation and the proof. Defendant's motion to dismiss the kidnapping charge was properly denied. His sixth assignment of error is overruled.

After Sergeant Vallender had testified for the State and defendant had testified in his own behalf and rested, Officer Vallender was recalled by the prosecution. The officer testified, in rebuttal, that he saw defendant in the hospital in Laurinburg while defendant was being examined; that defendant had a bruise in the center of his belt line in the back, "some cuts on his face and he had a bruise by his right eye, a black and blue mark." The officer then read verbatim, without objection, a written statement

defendant had given on 21 October tending to show that Peter Fearing, Ronald Elkins and Brian Jones had feloniously assaulted him and he had shot them in self-defense. At this point, the following exchange occurred:

"Q. On the way back from Laurinburg did you have any conversations with Gregory Hudson Jones concerning any bruises or abrasion he might have?

MR. SPERRY [defense counsel]: Objection to any conversations he might have had coming from Laurinburg.

COURT: Overruled.

MR. SPERRY: Without the proper foundations I would like to make an objection specifically.

COURT: Well, overruled, as to the ground work.

DEFENDANT'S EXCEPTION NO. 86

A. Yes sir, I did.

MR. SPERRY: Motion to strike.

COURT: Denied.

DEFENDANT'S EXCEPTION NO. 87

A. I made him no threats. I gave him his rights as soon as we got into the vehicle, and he waived his rights at that time. I had a general conversation with him on the way back, but I didn't threaten him or coerce him in any way. I asked him what happened to him that was concerning the bruises I saw on his face.

Q. What, if anything, did he say to you?

MR. SPERRY: Objection.

COURT: Overruled.

DEFENDANT'S EXCEPTION NO. 88

MR. SPERRY: Motion for voir dire, please sir.

COURT: The request is denied.

DEFENDANT'S EXCEPTION NO. 89

A. He said, 'They beat the hell out of me when they arrested me.'

MR. SPERRY: Move to strike.

COURT: Denied.

DEFENDANT'S EXCEPTION NO. 90"

Defendant contends he was in custody while being transported from Laurinburg to New Hanover County by one of the arresting officers; that he made a specific request for a voir dire to determine whether any statements he made in transit were admissible for any purpose and that the court erred to his prejudice by admitting the evidence without first conducting a voir dire hearing. This constitutes his seventh assignment of error.

In a criminal trial when the State offers a confession, or any statement by the accused inculpatory in nature, and the defendant objects and requests a voir dire to determine the competency of the proffered evidence, the trial judge must conduct an inquiry in the absence of the jury at which he hears the evidence, observes the demeanor of the witnesses, and resolves the question by appropriate findings and conclusions. *State v. Fox*, 277 N.C. 1, 175 S.E. 2d 561 (1970); *State v. Vickers*, 274 N.C. 311, 163 S.E. 2d 481 (1968); *State v. Barber*, 268 N.C. 509, 151 S.E. 2d 51 (1966).

Dean Wigmore defines a confession as "an acknowledgment in express words, by the accused in a criminal case, of the truth of the guilty fact charged or of some essential part of it." Wigmore on Evidence (3d ed. 1940) § 821. *Accord, State v. Fox*, supra; *State v. Hamer*, 240 N.C. 85, 81 S.E. 2d 193 (1954).

[6, 7] Here, defendant's statement that "they beat the hell out of me when they arrested me" is not a confession. It contains no acknowledgment of defendant's guilt of any of the charges against him or of any essential element thereof. Therefore, legal rules governing determination of the competency of inculpatory statements are not applicable. The presiding judge was not required to conduct a voir dire before ruling on the admissibility of defendant's statement. *State v. Shaw*, 284 N.C. 366, 200 S.E. 2d 585 (1973). Moreover, the statement was properly admitted. Defendant's testimony from the witness stand and the written

statement he gave to officers on 21 October 1975 both strongly indicate that the bruises and cuts on defendant's body and face were inflicted by Peter Fearing, Ronald Elkins and Brian Jones in a murderous assault upon him as a result of which he feared death or great bodily harm and shot them in his own self-defense. His prior inconsistent statement that "they beat the hell out of me when they arrested me" was competent to impeach and contradict his 21 October statement and his testimony before the jury. *State v. Bryant*, 280 N.C. 551, 187 S.E. 2d 111 (1972); *Harris v. New York*, 401 U.S. 222, 28 L.Ed. 2d 1, 91 S.Ct. 643 (1971). Defendant's seventh assignment is overruled.

In Case No. 75CRS15633 the words "for the term of not less than twenty (20) nor more than twenty-five (25) years in the State Prison of North Carolina" are stricken from the judgment and commitment and the words "for the term of twenty (20) years in the State Prison of North Carolina" are inserted in lieu thereof.

In Case No. 75CRS15636 the words "for the term of not less than nineteen (19) nor more than twenty (20) years in the State Prison of North Carolina" are stricken from the judgment and commitment and the words "for the term of not less than eighteen (18) nor more than twenty (20) years in the State Prison of North Carolina" are inserted in lieu thereof.

In Case No. 75CRS15637 the words "for the term of not less than nine (9) nor more than ten (10) years in the State Prison of North Carolina" are stricken from the judgment and commitment and the words "for the term of not less than eight (8) nor more than ten (10) years in the State Prison of North Carolina" are inserted in lieu thereof.

The Clerk of the Superior Court of New Hanover County shall issue revised commitments in those three cases bearing the same date as the original commitments, to be substituted for the commitments heretofore issued. The effect will be, and it is so intended, that the sentences in these three cases shall be identical in length to the sentences imposed at the first trial, and defendant will receive credit upon the new commitment for all time heretofore served for the kidnapping and the two felonious assaults involved in the three cases. In all other respects, prejudice otherwise not having been shown, the verdicts and judgments must be upheld.

In Cases Nos. 15634, 15635, 15639 and 15638—No error.

In Cases Nos. 15633, 15636 and 15637—Sentences modified.