STATE OF NORTH CAROLINA v. EDWARD LAVONNE HORNSBY

No. COA01-1070

(Filed 20 August 2002)

**1. Homicide— first degree murder—short-form indictment—constitutional**

The short-form murder indictment is constitutional.

**2. Homicide— first-degree murder—instruction on second-degree denied—no error**

The trial court in a first-degree murder prosecution did not err by denying defendant's request to instruct the jury on second-degree murder as a lesser included offense where defendant asserted mental illness, but the State's evidence established every element of first-degree murder, including premeditation and deliberation, and there was no evidence to negate these elements.

**3. Appeal and Error— preservation of issues—erroneous pattern jury instruction—no objection—standard of review—not plain error**

A first-degree murder defendant preserved an alleged error in the insanity instruction for appellate review by traditional rather than plain error standards where the State requested that the jury be instructed in accordance with the pattern instructions and represented to the court and to defense counsel that the tendered instructions were in accordance with the pattern instructions.

The acquiescence of defense counsel to the instructions satisfied the requirements of N.C.R. App. 10(b)(2).

**4. Criminal Law— insanity instruction—burden of proof—no prejudicial error**

There was no prejudicial error in a first-degree murder prosecution where the instruction on insanity tendered by the State and given by the trial court erroneously included "not" in the second sentence. Viewed contextually, the entire instruction placed the burden on the State to prove each element of the offense beyond a reasonable doubt and then upon the defendant to prove his insanity to the jury's satisfaction, and the mandate clearly instructed the jury that it would return a verdict of not guilty if it had a reasonable doubt as to any element of the offense or if it was satisfied defendant was insane.

Appeal by defendant from judgment entered 9 January 2001 by Judge Knox V. Jenkins, Jr., in Harnett County Superior Court. Heard in the Court of Appeals 6 June 2002.

*Attorney General Roy A. Cooper, III, by Assistant Attorney General John G. Barnwell, for the State.*

*Appellate Defender Staples Hughes, by Assistant Appellate Defender Benjamin Dowling-Sendor.*

MARTIN, Judge.

Defendant, Edward Lavonne Hornsby, appeals from a judgment sentencing him to life imprisonment without parole entered upon his conviction by a jury of the first degree murder of Sharon Renee Moore. The State's evidence at trial tended to show that defendant and Sharon Renee Moore lived together as husband and wife, though they were not married. On the morning of 21 March 2000, eleven-year-old Adam Barefoot, the "adopted" son of defendant and Moore, overheard defendant and Moore arguing, and heard Moore "saying something like, 'Don't be pointing no gun at me.'" Soon after, Barefoot went to school. When Barefoot returned home that afternoon, his aunt and uncle, Bobby and Laverne Berry, and their three sons were at his house. After the Berry family left, Barefoot again heard defendant and Moore arguing; he began working on his homework, a report on John F. Kennedy, and talked to defendant and Moore about the report. According to Barefoot, defendant stated, " 'Ain't the person who killed him Lee Harvey Oswald?' " Barefoot

responded by reading out loud from a book that Oswald had shot John F. Kennedy in the back of the head with a scoped rifle. Defendant then went into the bedroom, retrieved a rifle, and aimed it at Moore, who was sitting next to Barefoot on the couch in the living room. Defendant told Moore that she better leave before he killed her. Moore then got up, took Barefoot's hand, and stated, " 'Well, if I go, Adam's going with me.' " At that point, Barefoot said, " 'Renee goes, I'm going too[.]' " Defendant then responded, " 'Everything's cool' ", placed the gun back in its case in the bedroom, and stated, " 'All right. Let's just watch some TV.' "

Later the same evening when a car went by, defendant said to Moore, " 'There goes your ride.' " Then Barefoot stated to defendant " 'Guess where your ride is[?]' " and pointed toward defendant's legs. Defendant became angry and went into the bedroom and retrieved his gun. When he returned to the living room, defendant pointed the gun barrel at Moore's head. Moore attempted to knock the barrel away from her head with her right arm while she was holding Barefoot with her left arm. Defendant shot Moore in the head, then walked back into the bedroom and put the gun away. He returned to the living room, stepped over Moore, picked up the telephone, and called 911. During the 911 call, defendant stated that he "killed the devil" and referred to Moore's body as a dead snake. Meanwhile, Barefoot went next door and asked the neighbor to call the police. An autopsy report revealed that Moore's death was caused by a gunshot wound to the head from a range of 2 to 3 inches. At trial, Barefoot identified a scoped, high-powered rifle as the weapon defendant had used to shoot Moore.

Deputy Sheriff David Kinton was the first officer to arrive at the crime scene. He noticed that defendant had been smoking a marijuana joint but he did not detect the odor of alcohol on defendant's person. Defendant's house was searched pursuant to a search warrant and four firearms were seized, including the suspected murder weapon. Additionally, marijuana plants were seized from an outbuilding as well as two small bags of processed marijuana located in defendant's bedroom.

After having waived his *Miranda* rights, defendant answered questions asked by Harnett County Sheriff's Detective Joseph Webb. Defendant admitted to shooting and killing Moore. When asked why he shot Moore, defendant stated, "[b]ecause she was the devil in disguise and because she was going to leave me and wouldn't do what I wanted."

There was also evidence that during the Berry family's visit for dinner on the evening Moore was killed, Laverne Berry, Moore's sister, helped Moore in the kitchen while defendant and Bobby Berry went over book work for their trucking business in the living room. While in the kitchen Laverne Berry and Moore discussed Moore's plan to leave defendant the next morning with Laverne's assistance. During dinner, defendant stated, " 'That will be your last supper, Renee. Your hear me, Renee? That's your last supper.' " Bobby Berry testified that he did not think the comment was unusual because defendant had previously told Moore that "they needed to get a lawyer and split things up 50, 50." Bobby Berry assumed defendant made the "last supper" comment because he wanted Moore to leave. Laverne Berry recalled that when defendant had been released from Dorothea Dix Hospital after a hospitalization in 1998, he stated that "he could commit murder and get by with it. He could plead insanity, and . . . he would spend about 2 years in prison and he could handle 2 years."

Barefoot testified that prior to 21 March 2000, defendant had injured his neck and two of his fingers. According to Barefoot, defendant had been "acting a little crazy." As an example, Barefoot recalled an occasion when defendant awakened him at 3:00 a.m., made him get dressed, and had him read the Bible. According to Barefoot, the night before the shooting occurred, defendant read the Bible over Moore while holding a fork.

Defendant gave pre-trial notice, pursuant to G.S. § 15A-959, of his intent to rely upon the defense of insanity and to offer expert testimony in support of the defense. At trial, defendant offered the testimony of Steven Buckliew concerning an incident which occurred at a job site during the summer of 1998, prior to defendant's earlier admission to Dorothea Dix Hospital. According to Mr. Buckliew, when he asked defendant how he was doing, defendant appeared to become upset and responded, "Get off the job site now. You're no Christian. The truth is not in you."

There was also evidence that defendant had been involuntarily committed to Dorothea Dix Hospital on 2 October 1998. He was treated with Haldol, an anti-psychotic medication, and Paxil, which is a medication for depression. Upon discharge on 14 October 1998, defendant was diagnosed with "manic depressive disorder, severe, with psychotic features." Defendant had a follow-up appointment at Harnett Mental Health Center in which he saw a clinical social worker who noted that defendant refused to take his prescribed medications,

Haldol and Prozac. Subsequently, on 30 October 1998, defendant was again involuntarily committed, initially to Good Hope Hospital and then was transferred to Dorothea Dix Hospital. He was discharged on 3 November 1998 and was diagnosed upon discharge with "adjustment disorder with mixed disturbance of emotions and conduct, and other substance abuse[;] [p]ersonality disorder: [n]arcissistic and dependent traits."

Defendant offered the testimony of Dr. James Hilkey, a psychologist received by the trial court as an expert in forensic psychology. Dr. Hilkey testified that he based his opinions on interviews with defendant, conversations with defendant's sister and mother, psychological tests given to defendant, and psychological records from Dorothea Dix Hospital and other facilities. When Dr. Hilkey initially interviewed defendant, defendant was taking Effexor, an antidepressant medication, which Dr. Hilkey testified is commonly used to treat affective disorders such as bipolar disorders or mood swings. According to defendant, this medication helped him control his mood and thoughts.

Dr. Hilkey also reviewed assessments made by Dr. Peter Barboriak and Dr. Nicole Wolfe, both of whom are forensic psychiatrists at Dorothea Dix Hospital. During an admission on 30 March 2000 for evaluation of defendant's competency to proceed, Dr. Barboriak diagnosed defendant as suffering from psychotic disorder not otherwise specified; alcohol and cannabis dependence; and personality disorder with antisocial and paranoid traits. Dr. Wolfe subsequently conducted a psychiatric assessment of defendant's criminal responsibility at the time of the offense. She diagnosed defendant as having depressive disorder, not otherwise specified; probable cannabis induced psychotic disorder (marijuana use causing psychosis); cannabis dependence; and alcohol dependence. Dr. Wolfe further diagnosed defendant as having a personality disorder with antisocial and paranoid features. Dr. Hilkey testified that he agreed with Dr. Wolfe's diagnosis of personality disorder, but disagreed with her diagnosis of depressive disorder and cannabis induced psychotic disorder. Dr. Hilkey opined that defendant's psychiatric condition was not caused solely by his consumption of alcohol and marijuana. He testified that, in his opinion, at the time defendant shot Moore, he was suffering from a mental disease that impaired his ability to know right from wrong.

To rebut defendant's evidence of insanity, the State offered the testimony of Dr. Barboriak and Dr. Wolfe, both of whom were

STATE v. HORNSBY

[152 N.C. App. 358 (2002)]

accepted as expert witnesses in the field of forensic psychiatry. Dr. Barboriak evaluated defendant at Dorothea Dix between 30 March 2000 and 12 April 2000 with respect to his capacity to proceed. When Dr. Barboriak first saw defendant, he seemed relatively comfortable and in control; as his hospitalization continued, however, he became more suspicious, angry, and hostile. Dr. Barboriak testified that defendant denied having any visual or audible hallucinations. However, defendant admitted to heavy use of alcohol and marijuana, and stated that he was under the influence of alcohol at the time he shot Moore. Defendant's urine drug screen was positive for cannabinoids, the breakdown products of marijuana. According to defendant, he had smoked a lot of marijuana just prior to the shooting and he had been smoking marijuana since he was 14 years old. Dr. Barboriak opined that defendant was competent to stand trial. He did not recommend that defendant be placed on any medication because he did not have a firm idea of what medication defendant needed. In fact, it puzzled Dr. Barboriak that defendant appeared to get better even when he was not taking medications.

Dr. Wolfe evaluated defendant between 15 December 2000 and 29 December 2000 to assess his mental condition with respect to his criminal responsibility at the time of the shooting. Dr. Wolfe testified, contrary to Dr. Hilkey's testimony, that the medication Effexor, which defendant was taking at the time Dr. Hilkey interviewed him, is not used to treat bipolar disorder but instead is an antidepressant used to treat depression and generalized anxiety disorders. While defendant was in Central Prison, he had been prescribed Effexor and had reported that it had been helpful to him and so Dr. Wolfe continued the prescription. Dr. Wolfe explained that she did not find one diagnosis that defendant clearly met and that is why she believed he had probable cannabis-induced psychotic disorder.

When asked about the defendant's use of the words "snake" and "devil" when referring to Moore during his conversation with the 911 operator, Dr. Wolfe noted that defendant had also stated to the operator, "You might not understand my lango [sic][.] That's just the way I talk you know." Dr. Wolfe testified that those words suggested to her that defendant knew he had shot a person and not a snake. Dr. Wolfe testified that, in her opinion, defendant was criminally responsible for his actions on 21 March 2000 in that "he was not so impaired in the psychiatric processes that he couldn't appreciate the difference between right and wrong at the time of the alleged offense."

I.

**[1]** By nine assignments of error combined in one argument, defendant contends the "short-form" indictment for murder returned by the grand jury was inadequate to charge him with first degree murder under the United States Constitution and the Constitution of North Carolina. Defendant acknowledges that our Supreme Court has ruled against his position in holding that short-form indictments, authorized under G.S. § 15-144, are in compliance with both the North Carolina and United States Constitutions, *State v. Wallace*, 351 N.C. 481, 528 S.E.2d 326, *cert. denied*, 531 U.S. 1018, 148 L. Ed. 2d 498 (2000), and we overrule this assignment of error without discussion.

II.

**[2]** Defendant next argues that the trial court erred by denying his request to instruct the jury on second degree murder as a lesser included offense of first degree murder. Defendant asserts the evidence of defendant's mental illness at the time of the shooting would have given the jury a reasonable basis for deciding that the State did not prove premeditation or deliberation beyond a reasonable doubt.

First degree murder is defined as "the intentional and unlawful killing of a human being with malice and with premeditation and deliberation." *State v. Flowers*, 347 N.C. 1, 29, 489 S.E.2d 391, 407 (1997), *cert. denied*, 522 U.S. 1135, 140 L. Ed. 2d 150 (1998). Murder in the second degree, on the other hand, is "the unlawful killing of a human being with malice but without premeditation and deliberation." *Id*. The test for determining whether the trial court should have instructed the jury on second-degree murder is as follows:

> The determinative factor is what the State's evidence tends to prove. If the evidence is sufficient to fully satisfy the State's burden of proving each and every element of the offense of murder in the first degree, including premeditation and deliberation, and there is *no* evidence to negate these elements other than defendant's denial that he committed the offense, the trial judge should properly exclude from jury consideration the possibility of a conviction of second degree murder.

*State v. Strickland*, 307 N.C. 274, 293, 298 S.E.2d 645, 658 (1983), *overruled in part on other grounds by State v. Johnson*, 317 N.C. 193, 344 S.E.2d 775 (1986). "Premeditation means that the act was thought

out beforehand for some length of time, however short . . . ." *State v. Bullock*, 326 N.C. 253, 257, 388 S.E.2d 81, 83 (1990). Deliberation means that the fatal act was "executed with a fixed design to kill notwithstanding defendant was angry or in an emotional state at the time." *State v. Ruof*, 296 N.C. 623, 636, 252 S.E.2d 720, 728 (1979). Circumstances that are illustrative of the existence of premeditation and deliberation include:

> (1) absence of provocation on the part of the deceased, (2) the statements and conduct of the defendant before and after the killing, (3) threats and declarations of the defendant before and during the occurrence giving rise to the death of the deceased, (4) ill will or previous difficulties between the parties, (5) the dealing of lethal blows after the deceased has been felled and rendered helpless, (6) evidence that the killing was done in a brutal manner, and (7) the nature and number of the victim's wounds.

*State v. Olson*, 330 N.C. 557, 565, 411 S.E.2d 592, 596 (1992).

The evidence in the present case showed: defendant pointed a gun at Moore on the morning of 21 March 2000; he again threatened Moore that evening at supper by stating, "That will be your last supper, Renee;" he pointed his rifle at Moore shortly before shooting her; and he fired the fatal shot at point blank range. There was also evidence of the existence of ill will between defendant and Moore, as shown by their arguing at various times on the day of the killing and by Moore's plan to leave defendant. After he killed Moore, defendant stated that he shot her "[b]ecause she was the devil in disguise and because she was going to leave me and wouldn't do what I wanted." Moreover, there was no evidence of provocation on Moore's part. The State's evidence established each and every element of first degree murder, including premeditation and deliberation, and there was no evidence to negate these elements. Accordingly, the trial court correctly refused to submit the issue of defendant's guilt of second degree murder as a lesser included offense and defendant's assignment of error to the contrary is overruled.

### III.

[3] Defendant also assigns error to the trial court's instructions to the jury with respect to the defense of insanity and contends the error entitles him to a new trial. We must first consider the applicable standard of appellate review of his contentions. The State argues that our standard of review with respect to this assignment of error is lim-

ited to plain error review. The State's contention arises upon the failure of defendant's counsel to object after having reviewed a copy of the written instructions proposed by the State, which contained the error about which defendant complains, and his failure to object after the trial court had completed the instructions. *See* N.C.R. App. P. 10(b)(2).

The record discloses that during the conference on instructions, the prosecutor handed to the court "the instructions for the insanity defense under [pattern jury instruction] 304.10." Defendant's counsel stated, "I have read that . . . . [I]t appears to be in accordance with the pattern, Your Honor. So, we're satisfied with that . . . ." After the court completed its instructions to the jury, the court inquired of both the State and the defendant as to whether there were any requests for corrections or additions to the charge. Defendant's counsel responded, "[t]he defendant's satisfied with it, Your Honor." In fact, both the written request tendered by the prosecutor and the instruction read to the jury by the trial court contained an error, as will be hereinafter discussed.

We believe, following the reasoning of our Supreme Court in *State v. Keel*, 333 N.C. 52, 423 S.E.2d 458 (1992), defendant has preserved the issue for appellate review under traditional standards of review rather than a plain error standard. Because the State requested that the jury be instructed in accordance with the pattern instructions relating to first degree murder and the defense of insanity, and represented to the trial court and to defense counsel that the instructions which it tendered were, in fact, in accordance with the pattern instructions, the acquiescence of defense counsel to the instructions satisfied the requirements of Rule 10(b)(2) and preserved the question for review on appeal. *See Keel, supra.*

[4] In North Carolina, insanity is an affirmative defense to a criminal charge which excuses a defendant from criminal responsibility for an act which would otherwise be punishable as a crime. The test for insanity, as a criminal defense, is

> whether the defendant was laboring under such a defect of reason from disease or deficiency of mind at the time of the alleged act as to be incapable of knowing the nature and quality of his act or, if he did know this, was incapable of distinguishing between right and wrong in relation to such act.

*State v. Evangelista*, 319 N.C. 152, 161, 353 S.E.2d 375, 382 (1987) (citations omitted). The defense is unrelated to the existence or

nonexistence of the elements of the criminal act; thus, where a defendant raises the defense of insanity, the burden remains upon the State, as in every criminal prosecution, to prove the defendant's guilt by proving the existence of each element of the offense beyond a reasonable doubt. *State v. Marley*, 321 N.C. 415, 364 S.E.2d 133 (1988). If the State carries that burden, the burden shifts to the defendant to show, to the jury's satisfaction, his insanity. *Id.; Evangelista, supra.*

In accordance with the State's request, the trial court read to the jury instructions with respect to the defense of insanity as follows:

When there's evidence which tends to show that the defendant was legally insane at the time of the alleged offense, you will consider this evidence only if you find that the state has proved beyond a reasonable doubt each of the things about which I've already instructed you. Even if the state does ***not*** prove each of these things beyond a reasonable doubt, the defendant would nevertheless be not guilty if he was legally insane at the time of the offense (emphasis added).

The first sentence of the instruction given is identical to N.C.P.I.—Crim. 304.10. However, the second sentence of the instruction as read to the jury, and quoted above, erroneously included the word "***not***"; the instruction should have read:

Even if the State does prove each of these things beyond a reasonable doubt, the defendant would nevertheless be not guilty if he was legally insane at the time of the alleged offense.

N.C.P.I.—Crim. 304.10. The defendant asserts the instructional error had the effect of instructing the jury that the insanity defense would apply only if (1) the State failed to prove each element of first-degree murder beyond a reasonable doubt and (2) the defendant proved the insanity defense to the satisfaction of the jury. The State concedes the instructional error but argues the error does not entitle defendant to a new trial because the instructions, construed contextually and as a whole, were correct.

It is well established that "the trial court's charge to the jury must be construed contextually and isolated portions of it will not be held prejudicial error when the charge as a whole is correct." *State v. Boykin*, 310 N.C. 118, 125, 310 S.E.2d 315, 319 (1984). While it is true that conflicting statements of law on a material point in the jury charge require a new trial, *State v. Schultz*, 294 N.C. 281, 240 S.E.2d

451 (1978), our courts have consistently held that where the charge as a whole presents the law fairly and clearly to the jury, isolated expressions standing alone, though erroneous, do not require reversal. *State v. Jones*, 294 N.C. 642, 243 S.E.2d 118 (1978). Such isolated portions may not be "detached from the charge as a whole and critically examined for an interpretation from which prejudice to defendant may be inferred." *Id.* at 653, 243 S.E.2d at 125 (citations omitted). We believe it is so in this case.

Applying these principles to the present case, we believe that, notwithstanding the instructional error, the entire charge viewed contextually correctly placed the burden upon the State to prove each element of the offense beyond a reasonable doubt and, in such event, the burden upon the defendant to prove his insanity to the jury's satisfaction. In its instructions, the trial court repeatedly informed the jurors of the State's burden of proving the defendant's guilt beyond a reasonable doubt. In addition, the trial court instructed the jury that it would consider the evidence of insanity only if the State proved each of the elements of first degree murder beyond a reasonable doubt, and that

> unlike the state, which must prove all other elements of the crime beyond a reasonable doubt, the defendant must only prove this insanity to your satisfaction . . . .

And, in its final mandate to the jury, the trial court clearly informed the jury that it should return a verdict of guilty of first degree murder if it found from the evidence beyond a reasonable doubt the existence of each of the elements of that offense, unless it was satisfied that defendant was insane at the time of the act. The mandate clearly instructed the jury that it would return a verdict of not guilty if it had a reasonable doubt as to any element of the offense or if it was satisfied defendant was insane. We hold that the trial court's instructions clearly informed the jury (1) the State's burden to prove defendant's guilt of each essential element of the offense of first degree murder; (2) only if the State met that burden was the jury to consider the insanity defense, and (3) defendant's burden to prove such defense to the jury's satisfaction. Therefore, we do not believe there is a reasonable possibility that a different result would have been reached had the trial court not committed the instructional error, G.S. § 15A-1443(a), and defendant's assignment of error is overruled.

Defendant received a fair trial, free from prejudicial error.

No prejudicial error.

Judges TIMMONS-GOODSON and CAMPBELL concur.