STATE OF NORTH CAROLINA v. AARON JONWAN BREWTON, Defendant

No. COA04-1127

(Filed 20 September 2005)

**1. Conspiracy— first-degree murder—sufficiency of evidence**

There was sufficient circumstantial evidence to deny defendant's motion to dismiss conspiracy to commit first-degree murder even though defendant's alleged co-conspirator testified that they did not expressly agree or plan to kill the victim. A reasonable juror could infer from the evidence an implicit agreement to work together.

**2. Conspiracy— first-degree murder—premeditation and deliberation inherent in agreement**

When a jury finds an agreement to commit a murder, it necessarily also finds premeditation and deliberation.

**3. Sentencing—** *Blakely* **error—harmless error not applicable**

A *Blakely* error in sentencing defendant with judicially found aggravating factors was not subject to harmless error analysis. Sentencing errors under *Blakely v. Washington,* 542 U.S. 296, are structural and reversible per se.

Appeal by defendant from judgment entered 13 May 2004 by Judge E. Penn Dameron, Jr. in Buncombe County Superior Court. Heard in the Court of Appeals 14 April 2005.

*Attorney General Roy Cooper, by Assistant Attorney General Amy C. Kunstling, for the State.*

*Cheshire, Parker, Schneider, Bryan & Vitale, by John Keating Wiles, for defendant-appellant.*

GEER, Judge.

Defendant Aaron Jonwan Brewton appeals from the judgment of the trial court finding him guilty of conspiracy to commit murder. Defendant argues on appeal that the trial court (1) erred when it denied his motion to dismiss the conspiracy charge because there was insufficient evidence to support such a charge, (2) committed plain error by not properly instructing the jury on the charge of conspiracy to commit murder, and (3) erred by imposing an aggravated sentence based upon judicially-found aggravating factors. We hold

that there was sufficient evidence to deny the motion to dismiss and that the court did not commit plain error in its instructions to the jury. With respect to defendant's sentence, however, we hold that under *State v. Allen*, 359 N.C. 425, 615 S.E.2d 256 (2005), this case must be remanded for a new sentencing hearing.

## Facts

The State's evidence tended to show the following. In January 2003, Neko Hyatt was stabbed to death by George Boston after an altercation outside a nightclub in Asheville, North Carolina. Defendant was present at the nightclub on the night of the murder and witnessed the altercation between Hyatt and Boston. Boston was later arrested and charged with the murder of Neko Hyatt.

In early May 2003, Boston was released on bond while the murder charge was pending. Those close to Neko Hyatt were upset, including Charles Hyatt (Neko Hyatt's brother) and defendant (Charles Hyatt's cousin). Boston's sister, Kimberly Boston, stated that her brother primarily stayed inside because there had been talk on the streets that something might happen to him.

On 24 May 2003, George Boston was sitting outside of the Deaverview Apartments. Kimberly Boston, who was also outside, saw two men drive by two or three times in a PT Cruiser, but she could not identify the men. Later, Kimberly saw a tall man, wearing a white T-shirt and a baseball cap on his head, come from behind one of the buildings. A deliveryman testified that the man had a white shirt or towel draped over what looked like a gun. The man raised his arm and fired three or four shots at George Boston before running to the PT Cruiser, which was waiting with the passenger door open. Kimberly chased after the PT Cruiser and got a partial license tag number. George Boston died later that day.

Kimberly Boston testified at trial that she believed, based upon the person's build, that defendant was the man who shot George Boston. Kimberly knew defendant because he had dated her sister for a time, and she also knew that defendant had recently made threats against her brother. George's older brother, Marcellus Boston, also identified defendant as the shooter based upon his build and from seeing his face from the eyes down. Marcellus could not see the shooter's entire face because he had a white shirt draped on his head. Another witness, Nikki Griffin, testified that while she could not see

**STATE v. BREWTON**

[173 N.C. App. 323 (2005)]

the shooter's face, she thought it was defendant based upon the way he carried himself.

After the shooting, the police radioed all officers to watch for a gold PT Cruiser with two black males in the area of Deaverview Apartments. Shortly thereafter, an officer spotted and subsequently stopped the PT Cruiser. The officer arrested the driver, Charles Hyatt. No one else was in the car at the time.

Hyatt, who was charged with first degree murder and conspiracy to commit first degree murder, was called to testify by the State at defendant's trial. He stated that, on 24 May 2003, defendant, who was driving a burgundy car, agreed to give Hyatt a ride to get something to eat. Later, defendant decided instead to go to Deaverview Apartments. Hyatt testified that he was "all right with that." The two of them then borrowed a PT Cruiser from Carmell Harding. Harding had rented the car from Enterprise Rent-A-Car. After defendant dropped off the burgundy car, defendant drove the two men to the Deaverview Apartments in the PT Cruiser. Hyatt testified that at that point he "had no clue" why they were going to the apartment complex. When they spotted George Boston, defendant said to Hyatt, "[t]here he goes" and exclaimed "[b]itch n——-r." Hyatt acknowledged that George Boston was the only person they were looking for and that when defendant said "there he goes," Hyatt knew whom he meant.

After saying "[t]here he goes," defendant stopped the car down the road from the apartments and Hyatt moved to the driver's seat. Defendant got out of the car with a t-shirt balled up in his hand and headed into some trees across the street. Hyatt claimed that he did not see defendant take a gun. Hyatt then got in the driver's seat and drove around the complex for a few minutes by himself. Defendant called Hyatt on his cell phone and said, "Let's roll." As Hyatt drove towards the apartment complex exit, he heard three or four gunshots, but did not see the shooting itself. Hyatt picked up defendant near the apartment complex exit and they drove away without saying a word.

At defendant's direction, Hyatt drove defendant to defendant's uncle's house near the French Broad River by a route through the countryside. Defendant never said anything about what had happened at the apartments. As Hyatt was driving the PT Cruiser back to Asheville to return it to Harding, he was stopped by the police.

When interviewed by the police that afternoon, Hyatt initially falsely told them that he alone had borrowed the PT Cruiser and was by himself at Deaverview Apartments when defendant called to ask him for a ride. Hyatt claimed that he had simply picked defendant up and driven defendant to defendant's uncle's house. When the police asked Hyatt to call defendant on his cell phone, he refused to do so. Later, Hyatt gave statements consistent with his trial testimony. Hyatt also testified at trial that defendant had not discussed going to Deaverview Apartments to kill Boston and that there was no plan or agreement. According to Hyatt, it "just happened."

Defendant was subsequently indicted with first degree murder and conspiracy to commit first degree murder. These charges were tried on 10 May 2004 before Judge E. Penn Dameron, Jr. in Buncombe County Superior Court. The jury found defendant guilty of conspiracy to commit first degree murder. It could not, however, reach a unanimous verdict on the first degree murder charge, and the judge declared a mistrial as to that charge.

In the sentencing phase, Judge Dameron found as aggravating factors that (1) the offense was committed to disrupt the lawful exercise of a governmental function or the enforcement of the laws, (2) defendant knowingly created a great risk of death to more than one person by means of a weapon or device, and (3) defendant committed the offense while on pre-trial release. The judge found as mitigating factors that (1) defendant had a support system in the community, and (2) defendant had a positive employment history. The judge concluded that the aggravating factors outweighed the mitigating factors and sentenced defendant in the aggravated range to a term of 276 to 341 months imprisonment.

Defendant gave oral notice of appeal from his conviction for conspiracy to commit murder following sentencing on 13 May 2004. Defendant later filed a motion for appropriate relief with this Court on 13 October 2004 based on *Blakely v. Washington*, 542 U.S. 296, 159 L. Ed. 2d 403, 124 S. Ct. 2531 (2004).

I

[1] Defendant first assigns error to the trial court's denial of his motion to dismiss the charge of conspiracy to commit first degree murder. Defendant argues that there was insufficient evidence of an agreement between defendant and Charles Hyatt to support a

finding of a conspiracy. When considering a motion to dismiss by a criminal defendant, the trial court must determine whether the State has presented substantial evidence of every essential element of the crime and that the defendant is the perpetrator. *State v. Robinson*, 355 N.C. 320, 336, 561 S.E.2d 245, 255, *cert. denied*, 537 U.S. 1006, 154 L. Ed. 2d 404, 123 S. Ct. 488 (2002). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Brown*, 310 N.C. 563, 566, 313 S.E.2d 585, 587 (1984). When considering a motion to dismiss, the court must consider the evidence "in the light most favorable to the State, giving the State the benefit of every reasonable inference and resolving any contradictions in its favor." *State v. Rose*, 339 N.C. 172, 192, 451 S.E.2d 211, 223 (1994), *cert. denied*, 515 U.S. 1135, 132 L. Ed. 2d 818, 115 S. Ct. 2565 (1995). " 'In "borderline" or close cases, our courts have consistently expressed a preference for submitting issues to the jury . . . .' " *State v. Jackson*, 103 N.C. App. 239, 244, 405 S.E.2d 354, 357 (1991) (quoting *State v. Hamilton*, 77 N.C. App. 506, 512, 335 S.E.2d 506, 510 (1985), *cert. denied*, 315 N.C. 593, 341 S.E.2d 33 (1986)), *aff'd per curiam*, 331 N.C. 113, 413 S.E.2d 798 (1992).

A criminal conspiracy is "an agreement, express or implied, between two or more persons, to do an unlawful act or to do a lawful act in an unlawful way or by unlawful means." *State v. Gell*, 351 N.C. 192, 209, 524 S.E.2d 332, 343, *cert. denied*, 531 U.S. 867, 148 L. Ed. 2d 110, 121 S. Ct. 163 (2000). While the existence of an agreement is an essential element of conspiracy, an express agreement is not required in order to show that a conspiracy existed. *State v. Lawrence*, 352 N.C. 1, 24, 530 S.E.2d 807, 822 (2000), *cert. denied*, 531 U.S. 1083, 148 L. Ed. 2d 684, 121 S. Ct. 789 (2001). As the Supreme Court stated in *Lawrence*:

> A mutual, implied understanding is sufficient, so far as the combination or conspiracy is concerned, to constitute the offense. The existence of a conspiracy may be shown with direct or circumstantial evidence. The proof of a conspiracy may be, and generally is, established by a number of indefinite acts, each of which, standing alone, might have little weight, but, taken collectively, they point unerringly to the existence of a conspiracy.

*Id.* at 24-25, 530 S.E.2d at 822 (internal citations and quotation marks omitted). On the other hand, "[w]hile conspiracy can be proved by

inferences and circumstantial evidence, it 'cannot be established by a mere suspicion, nor does a mere relationship between the parties or association show a conspiracy.' " *State v. Benardello*, 164 N.C. App. 708, 711, 596 S.E.2d 358, 360 (2004) (quoting *State v. Massey*, 76 N.C. App. 660, 662, 334 S.E.2d 71, 72 (1985)).

Since Hyatt testified that he and defendant did not expressly agree or plan to kill Boston, the State had no direct evidence of conspiracy and had to rely upon circumstantial evidence. After reviewing the evidence in the light most favorable to the State, we find there was sufficient circumstantial evidence to support a charge of conspiracy to commit murder.

The evidence at trial indicated that both Hyatt and defendant were upset that Boston had been released on bond after killing Hyatt's brother. On the day of the murder, although Hyatt had requested a ride to get something to eat, defendant suggested instead that they go to Deaverview Apartments where they ultimately found Boston—a change with which Hyatt was "all right." Rather than simply driving there in defendant's girlfriend's car, which defendant already was driving, the two men borrowed a rental car from another person—conduct that the jury could view as an attempt to avoid identification. After driving back and forth through the apartment complex, defendant announced "[t]here he is," and Hyatt acknowledged that he understood defendant to be referring to Boston because that was the only person for whom they would be looking. Defendant immediately stopped the car and got out, while Hyatt drove around until he received a cell phone call from defendant, saying "[l]et's roll." At that point, Hyatt drove to a particular spot, stopped the car, and opened the passenger door. Although Hyatt heard a series of gunshots, he did not say anything to defendant after defendant jumped in the car, but simply drove him through the countryside to defendant's uncle's house. When he was stopped by the police while heading back to return the car, he initially told a false story to cover up the fact that the two men had together borrowed the PT Cruiser and gone to the Deaverview Apartments.

A reasonable juror could infer from this evidence an implicit agreement to work together to accomplish the goal of revenge for the murder of Hyatt's brother. There was evidence of motive, of a joint understanding that the two men would go to Deaverview Apartments, of a joint borrowing of a car without concrete ties to either one of them, of behavior consistent with Hyatt's driving a "get away" car, of a lack of any surprise on Hyatt's part regarding gunshots, and of

an effort on Hyatt's part to cover up the two men's joint activities. *See State v. Gibbs*, 335 N.C. 1, 48, 436 S.E.2d 321, 348 (1993) (finding that the defendants' actions after the crime were evidence of the conspiracy), *cert. denied*, 512 U.S. 1246, 129 L. Ed. 2d 881, 114 S. Ct. 2767 (1994).

Although defendant relies upon *State v. Merrill*, 138 N.C. App. 215, 221-22, 530 S.E.2d 608, 613 (2000), the evidence in that case showed only that the alleged co-conspirator had suggested killing the victim (but received no response from the defendant), and, after the murder, the defendant had assisted in concealing the crime. There was no evidence of any assistance by the defendant in furtherance of the murder; in fact, she was out of town at the time of the murder. This Court held that "[m]ere passive cognizance of the crime or acquiescence in the conduct of others will not suffice to establish a conspiracy. . . . It is not sufficient that the actor only believe that the result would be produced, but did not consciously plan or desire to produce it." *Id.* at 221, 530 S.E.2d at 612.

In this case, the State presented evidence suggesting not just an awareness by Hyatt that Boston might be killed, but also affirmative acts by Hyatt to assist defendant. A reasonable juror could view the evidence as establishing the "mutual, implied understanding" held in *Lawrence*, 352 N.C. at 25, 530 S.E.2d at 822, to be sufficient to support a conspiracy charge. Thus, based on the totality of the evidence and the inferences that reasonably can be drawn from it, the trial court did not err in denying defendant's motion to dismiss the conspiracy charge. *See Gell*, 351 N.C. at 209-10, 524 S.E.2d at 344 (holding that the record contained sufficient evidence of an agreement to rob or kill the victim when the co-defendants were aware of the defendant's intent to rob and harm the victim, the co-defendants assisted the defendant in entering the victim's house undetected and showed the defendant the location of the victim's money, and the co-defendants left the house with the defendant after the murder); *State v. Burmeister*, 131 N.C. App. 190, 199, 506 S.E.2d 278, 283 (1998) (holding that the State presented sufficient evidence of a conspiracy to commit murder when the defendant and a co-defendant left jackets, jewelry, and wallets in a car driven by a third person while they went to harass a couple with the defendant hinting that he might kill the couple; the defendant instructed the driver to leave if they were not back within 15 minutes; and the driver, after hearing six gunshots, told the police two false stories to explain his presence near the scene). Since the evidence in this case is more than a series of indef-

inite, unrelated acts and gives rise to more than a mere suspicion of conspiracy, this assignment of error is overruled.

## II

**[2]** Defendant's next assignment of error contends that the trial court erred in its instructions to the jury regarding conspiracy to commit murder. Defendant acknowledges that he did not object to the judge's instructions, but argues that the improper instructions constitute plain error. Plain error is a " '*fundamental* error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done, or where the error is grave error which amounts to a denial of a fundamental right of the accused . . . .' " *State v. Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983) (quoting *United States v. McCaskill*, 676 F. 2d 995, 1002 (4th Cir. 1982) (internal quotation marks omitted)). Defendant has also filed a motion for appropriate relief that asserts a claim for ineffective assistance of counsel based upon trial counsel's failure to object to the jury instruction.

As part of its instructions on the conspiracy charge, the trial court stated that "[f]or purposes of this conspiracy charge only, murder is the unlawful killing of another with malice." Defendant argues that this instruction fails to require the jury to find premeditation and deliberation, two of the underlying elements of first degree murder. In support of his argument, defendant relies upon *State v. Choppy*, 141 N.C. App. 32, 39, 539 S.E.2d 44, 49 (2000), *appeal dismissed and disc. review denied*, 353 N.C. 384, 547 S.E.2d 817 (2001), in which this Court held: "To prove that the defendant committed conspiracy to commit first-degree murder, the State must prove that the defendant agreed to perform every element of the crime—i.e., that he agreed to the intentional killing of a victim after premeditation and deliberation." *See also State v. Curry*, 171 N.C. App. 568, 578, 615 S.E.2d 327, 334 (2005) (holding that the jury must be instructed to find an agreement to commit first-degree murder). Defendant asserts that the conviction for *conspiracy to commit first degree murder cannot stand* because the jury was not required to find that defendant and Hyatt agreed to premeditate and deliberate. We disagree.

First-degree murder is " 'the intentional and unlawful killing of a human being with malice and with premeditation and deliberation.' " *State v. King*, 353 N.C. 457, 484, 546 S.E.2d 575, 595 (2001) (quoting *State v. Flowers*, 347 N.C. 1, 29, 489 S.E.2d 391, 407 (1997), *cert. denied*, 522 U.S. 1135, 140 L. Ed. 2d 150 (1998)), *cert. denied*, 534 U.S. 1147, 151 L. Ed. 2d 1002, 122 S. Ct. 1107 (2002). "Premeditation means

that the act was thought out beforehand for some length of time, however short . . . . Deliberation means that the fatal act was executed with a fixed design to kill notwithstanding defendant was angry or in an emotional state at the time." *State v. Hornsby*, 152 N.C. App. 358, 364-65, 567 S.E.2d 449, 454 (2002) (internal quotation marks and citations omitted), *appeal dismissed and disc. review denied*, 356 N.C. 685, 578 S.E.2d 316 (2003).

We believe that when a jury finds that a defendant has agreed with another person to commit a murder, it necessarily finds premeditation and deliberation as well. If a defendant plans and enters into an agreement to commit murder, he also must have thought about and considered his act before it was committed (premeditation) and he must have had a design or plan to kill (deliberation). There is no required time period to find premeditation and deliberation, and these states of mind can arise in the same amount of time it takes to devise and enter into an agreement to kill another. *State v. Sierra*, 335 N.C. 753, 758, 440 S.E.2d 791, 794 (1994) ("[T]here must be evidence that a defendant thought about the act for some length of time, however short, before the actual killing; no particular amount of time is necessary to illustrate that there was premeditation."). A defendant cannot plan and agree with another to commit a crime without also having premeditated and deliberated.

Our Supreme Court's decision in *Gibbs* supports this conclusion. In *Gibbs*, the Court, in recognizing the crime of conspiracy to commit felony murder, held:

> [T]he [trial] court did not instruct the jurors that an unintentional killing during a felony would support a finding of first-degree murder by reason of felony murder. Rather, they were instructed that to find a conspiracy to commit murder, they must first find an agreement to commit first-degree murder. *When they found an agreement to kill, the jurors eliminated the possibility that an unintentional felony murder formed the basis for the specific intent underlying the conspiracy of which they convicted defendant.*

335 N.C. at 52, 436 S.E.2d at 350 (emphasis added). This analysis acknowledges that the finding of "an agreement to kill" is equivalent to a finding of an agreement to commit an intentional murder even in the absence of an instruction requiring the latter finding. Similarly, we hold that the finding of an agreement to kill is equivalent to the finding of an agreement to premeditate and deliberate. *See also id.* at 48,

436 S.E.2d at 348 ("[W]e conclude the defendant committed the offense of conspiracy to commit murder when he, Doris, and Yvette agreed to kill Ann's family.").

We note that other jurisdictions that have considered the relationship of conspiracy to the elements of premeditation and deliberation have reached a similar conclusion. The California Supreme Court most recently addressed this issue in *People v. Cortez*, 18 Cal. 4th 1223, 77 Cal. Rptr. 2d 733, 960 P.2d 537 (1998), and concluded:

> [I]t logically follows that where two or more persons conspire to commit murder—i.e., intend to agree or conspire, [and] further intend to commit the target offense of murder, . . .—each has acted with a state of mind functionally indistinguishable from the mental state of premeditating the target offense of murder. The mental state required for conviction of *conspiracy* to commit murder necessarily establishes premeditation and deliberation of the target offense of murder . . . .

*Id.* at 1232, 77 Cal. Rptr. 2d at 738, 960 P.2d at 542 (internal citations and quotation marks omitted). The court ultimately held that "all conspiracy to commit murder is necessarily conspiracy to commit premeditated and deliberated first degree murder . . . ." *Id.* at 1237, 77 Cal. Rptr. 2d at 742, 960 P.2d at 546. *See also People v. Hammond*, 187 Mich. App. 105, 108, 466 N.W.2d 335, 337 (1991) (" 'Foreknowledge and plan are compatible with the substantive crime of first-degree murder as both the crime of conspiracy and the crime of first-degree murder share elements of deliberation and premeditation. Prior planning denotes premeditation and deliberation.' " (quoting *People v. Hamp*, 110 Mich. App. 92, 103, 312 N.W.2d 175, 180 (1981), *leave to appeal denied*, 417 Mich. 1053 (1983))). *But see United States v. Chagra*, 807 F.2d 398 (5th Cir. 1986) (holding that a person could impulsively plan and conspire to commit a murder without premeditating), *cert. denied*, 484 U.S. 832, 98 L. Ed. 2d 66, 108 S. Ct. 106 (1987).

The Maryland Court of Appeals recently analyzed the decisions of California, Michigan, and the Fifth Circuit, and concluded that the jury's finding of a conspiracy necessarily results in a finding of premeditation and deliberation:

> We think that the California court in *Cortez* and the Michigan court in *Hammond* were entirely correct in their analysis—that where the charge is made and the evidence shows that the

defendant conspired to kill another person unlawfully and with malice aforethought, the conspiracy is necessarily one to commit murder in the first degree (even if a murder pursuant to the conspiracy never occurs or, for whatever reason, amounts to a second degree murder), as the agreement itself, for purposes of the conspiracy, would supply the necessary deliberation and premeditation.

*Mitchell v. State*, 363 Md. 130, 149, 767 A.2d 844, 854 (2001). We find the Maryland, Michigan, and California decisions persuasive.

Accordingly, we hold that the trial court's instruction regarding conspiracy did not constitute error. The instructions required the jury to find all of the necessary elements of conspiracy to commit first degree murder. Additionally, because we find no error in the instructions, defendant's claim for ineffective assistance of counsel must also be rejected.

## III

**[3]** Defendant's final assignment of error asserts that he improperly received an aggravated sentence based upon judicially-found aggravating factors in violation of *Blakely v. Washington*, 542 U.S. 296, 159 L. Ed. 2d 403, 124 S. Ct. 2531 (2004). The State argues that this claim is procedurally barred because defendant failed to object at trial and that any error in not submitting the aggravating factors to the jury is harmless beyond a reasonable doubt.

The Supreme Court of this State addressed the impact of *Blakely* in *State v. Allen*, 359 N.C. 425, 615 S.E.2d 256 (2005). In *Allen*, the court held that "*Blakely* applies to North Carolina's Structured Sentencing Act" and that the portions of N.C. Gen. Stat. § 15A-1340.16 (2003) that permit the imposition of an aggravated sentence based upon judicial findings of aggravating factors "violate[] the Sixth Amendment as interpreted in *Blakely*." *Id.* at 426-27, 615 S.E.2d at 258. The Court further held that the harmless-error rule does not apply to sentencing errors under *Blakely* because such errors "are structural and, therefore, reversible *per se*." *Id.* at 444, 615 S.E.2d at 269.

The holdings set forth in *Allen* and *Blakely* apply to " 'cases that are now pending on direct review.' " *Id.* at 427, 615 S.E.2d at 258 (quoting *State v. Lucas*, 353 N.C. 568, 598, 548 S.E.2d 712, 732 (2001), *overruled in part by Allen*, 359 N.C. at 437, 615 S.E.2d at

265). Under *Blakely* and *Allen*, the trial court erred in this case by imposing an aggravated sentence based upon aggravating factors found by the trial judge and not by the jury. Because such errors are reversible *per se*, we remand this case to the trial court for a new sentencing hearing.

No error in conviction; remanded for resentencing.

Judges TIMMONS-GOODSON and CALABRIA concur.