STATE OF NORTH CAROLINA
v.
RYAN JOSEPH LALIBERTE
No. COA08-1354
Court of Appeals of North Carolina
Filed September 1, 2009
This case not for Publication
Attorney General Roy Cooper, by Assistant Attorney General William P. Hart, Jr., for the State.
Mark Montgomery, for Defendant.
ERVIN, Judge.
Ryan Joseph Laliberte (Defendant) appeals from judgment entered 24 April 2008 based on a jury verdict convicting him of voluntary manslaughter in connection with the 7 December 2006 shooting death of Raphael Eason (Eason) and sentencing him to a minimum term of 60 months imprisonment and a maximum term of 81 months imprisonment in the custody of the North Carolina Department of Correction. After careful consideration of the briefs, record, and applicable law, we find no error and uphold the trial court's judgment.
On 7 December 2006, Eason; Eason's girlfriend, Brandy Butcher (Butcher); and Eason's cousin, Shamel Page (Page), decided that Defendant had possession of Eason's Pit Bull puppy, which had been missing for several days. For that reason, Eason, Butcher and Page went to Defendant's residence to confront Defendant about the missing puppy. At that time, Eason was six feet, six inches tall and weighed 290 pounds, while Defendant was sixteen years old; five feet, three inches tall; and weighed 115 pounds.
Although Defendant and his girlfriend, Rachel Bates (Bates), were not at home when Eason, Butcher, and Page arrived, they returned shortly thereafter, with Defendant arriving first and Bates driving up somewhat later. At the time that Defendant returned home, Eason approached him to discuss the situation regarding the puppy. As Defendant and Eason talked, a heated argument developed, during which Defendant and Bates denied any knowledge of the whereabouts of the missing puppy.
At some point, Eason and Butcher entered the residence in which Defendant and Bates resided in order to determine whether the puppy was there. During that time, Butcher noticed Bates give an unidentified object, which Butcher thought might have been a gun, to Defendant. According to Page, Bates had a pistol and threatened to shoot him. However, Page testified Defendant took the pistol from Bates and put it in his waistband. Defendant testified that the pistol was on a couch in the house where anyone could have gotten it and that Bates picked it up and gave it to him. After Eason and Butcher were satisfied that the puppy was not in the residence, the group returned to the front yard.
At some point, Defendant stated that his friend, Bruce, had the puppy, and that he could take Eason and Butcher to Bruce's house to retrieve the animal. As a result, Eason, Butcher, Page, Defendant, and Bates prepared to go to Bruce's house. Butcher volunteered to ride with Defendant and Bates to make sure that they did not notify Bruce that the group was on its way. As she was entering the vehicle in which she, Defendant, and Bates were going to travel to Bruce's residence, Butcher noticed Bates talking in a whispered tone on a cell phone. At that point, Bates quickly terminated the call and dropped the cell phone on the front floorboard. When the phone rang again, Defendant answered it. After hearing some discussion of the puppy, Butcher concluded that Defendant and Bates were trying to warn Bruce of their impending visit, so she grabbed the phone, exited the vehicle, ascertained that Bruce was on the line, and demanded that he tell her what he and Bates had discussed. Butcher believed that Bates had told Bruce to hide the puppy. While Butcher was talking to Bruce, Eason exited his own vehicle and came over to find out what was going on. At that point, Bates ran to call law enforcement. The evidence presented at trial sharply conflicted as to what happened next. However, by all accounts, Defendant shot Eason one time with a .32 caliber Iver Johnson revolver, causing his death.
According to the State's evidence, after Butcher advised him of what had happened, Eason confronted Defendant behind Butcher's back while she continued to talk to Bruce. As the conversation grew more heated, Butcher turned around and saw Defendant extend his arm and shoot Eason, who immediately fell to the ground. According to Page, Defendant said, "F*** this s***," just before shooting Eason. Both Butcher and Page denied hearing Eason threaten physical harm to Defendant or Bates. After the shooting, Butcher testified that she ran to protect her two-year old child, at which point Defendant threatened to shoot her as well, causing her to flee from the area until law enforcement officers returned.
On the other hand, the evidence offered by Defendant tended to show that, as the group got ready to leave for Bruce's residence, Eason said that he was not afraid to go back to jail. After Butcher told Eason that Bates and Defendant had warned Bruce that they were coming, Bates ran away, Eason became angrier and angrier, and Butcher told Eason to "take care of" Defendant. At that point, Defendant testified that Eason stepped forward; asked, "Are you afraid to die?"; and grabbed him around the neck. Defendant claimed to know of prior threats that Eason and Butcher had made against others relating to the puppy. Defendant testified that he was cornered between the doors of the cars and Eason and that he was afraid that Eason had a gun.[1] For that reason, he fired the pistol at Eason. When Bates heard the shot, she came back to Defendant, who stated that he did not mean to shoot Eason and claimed that he thought Eason had a gun. Mark Duncan, an expert in firearms safety and self-defense, testified that the bullet's trajectory indicated that Eason was charging at Defendant at the time that he was shot and that, given the huge size disparity between the two combatants, Eason could have inflicted serious injury on Defendant with his bare hands.
On 23 April 2007, the Camden County grand jury returned a true bill of indictment charging Defendant with second degree murder. The charge against Defendant came on for trial at the 21 April 2008 session of Camden County Superior Court. On 24 April 2008, the jury returned a verdict convicting Defendant of the lesser included offense of voluntary manslaughter. On the same date, the trial court entered a judgment sentencing Defendant to a minimum term of 60 months imprisonment and a maximum term of 81 months imprisonment in the custody of the North Carolina Department of Correction. Defendant noted an appeal to this Court from the trial court's judgment.

I: Motion to Dismiss
Defendant first contends that the trial court erred by denying his motion to dismiss the manslaughter charge because all of the evidence showed that he acted in self-defense. After careful consideration of the evidentiary record in light of the applicable law, we disagree.
According to well-established North Carolina law:
Upon defendant's motion for dismissal, the question for the Court is whether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant's being the perpetrator of such offense. If so, the motion is properly denied. . . . If the evidence is sufficient only to raise a suspicion or conjecture as to either the commission of the offense or the identity of the defendant as the perpetrator of it, the motion should be allowed.
State v. Barnes, 334 N.C. 67, 75, 430 S.E.2d 914, 918 (1993) (quoting State v. Powell, 299 N.C. 95, 98, 261 S.E.2d 114, 117 (1980)). In reviewing challenges to the sufficiency of evidence, we view the evidence in the light most favorable to the State, giving the State the benefit of all reasonable inferences that can be drawn from the evidentiary record. State v. Benson, 331 N.C. 537, 544, 417 S.E.2d 756, 761 (1992). Any contradictions and discrepancies in the record evidence are not grounds for dismissal, but simply create issues of fact for the jury to resolve. Benson, 331 N.C. at 544, 417 S.E.2d at 761.
Voluntary manslaughter "is the unlawful killing of a human being without malice and without premeditation and deliberation." State v. Kea, 256 N.C. 492, 493, 124 S.E.2d 174, 175 (1962). An intentional killing "done in the heat of passion suddenly aroused by adequate provocation or in the exercise of imperfect self-defense where excessive force under the circumstances was used or where the defendant is the aggressor" is voluntary manslaughter. State v. Wallace, 309 N.C. 141, 149, 305 S.E.2d 548, 553 (1983) (citing State v. Norris, 303 N.C. 526, 279 S.E.2d 570 (1981); State v. Wilkerson, 295 N.C. 559, 247 S.E.2d 905 (1978)).
Although the evidence in the record is in sharp conflict on many points, Butcher testified that, while she and Eason were in the residence shared by Defendant and Bates for the purpose of ascertaining whether Defendant and Bates were in possession of the puppy, Bates passed Defendant "what [was] obviously the weapon that killed him." As Eason approached Defendant after Butcher learned that Bates had been talking to Bruce, Butcher "heard the conversation escalating[,]" so she stopped talking to Bruce. When she turned around, she saw Defendant "raise his arm up and shoot my boyfriend through his head." According to Butcher, Defendant turned, "pointed that gun [at] me and said, `I should shoot you too.'" Defendant did not lower the weapon; instead, he continued to point it at Butcher, causing Butcher to run away. Butcher testified that she was so frightened and ran so fast that she lost her shoes in the process of leaving the area.
Although Page testified that Bates was "the main one fussing all the time[,]" he acknowledged that everyone was arguing about the missing puppy. After he saw Bates run away, Page testified that Defendant said, "`F*** this s***.' Pow. I seen it." "One" shot was fired, and "I looked[;] I was shocked, I'm like, this ain't happening. I seen it on TV but I ain't never seen it in real life. I'm just sitting here dazed, he started running at me. I ran."
The testimony of Butcher and Page, if believed, tends to show that, during a heated argument over the whereabouts of the puppy, Defendant shot Eason at a time when Eason was unarmed. This evidence, while admittedly contradicted by the testimony of other witnesses, is sufficient to support a jury determination that Defendant killed Eason when he was either acting as the aggressor or using excessive force. As a result, the record contains evidence tending to show the existence of each element necessary for a finding that Defendant was guilty of voluntary manslaughter on a theory of imperfect self-defense, so that the trial court did not err by denying Defendant's motion to dismiss the voluntary manslaughter charge.

II: Jury Instruction
Next, Defendant contends that the trial court erred by instructing the jury that it could find that Defendant acted as the "first aggressor" or used "excessive force" and thereby find him guilty of voluntary manslaughter on an imperfect self-defense theory because there was no evidence to support a jury determination that either of these prerequisites for the presence of "imperfect self-defense" existed. After carefully considering the applicable law and the record evidence, we reject Defendant's challenge to the trial court's "imperfect self defense" instruction.
A trial court's jury instructions should be "a correct statement of the law and . . . supported by the evidence." State v. Conner, 345 N.C. 319, 328, 480 S.E.2d 626, 629 (1997), writ denied, 361 N.C. 431, 648 S.E.2d 850 (2007). A trial court's instructions are not erroneous where they are supported by the evidence. State v. Morganherring, 350 N.C. 701, 736, 517 S.E.2d 622, 642 (1999), cert. denied, 529 U.S. 1024, 146 L. Ed. 2d 322 (2000), writ granted on other grounds, 356 N.C. 295, 570 S.E.2d 894 (2002). "[W]hen [the] charge, as a whole, presents the law accurately, fairly, and clearly to the jury, reversible error does not occur." State v. Every, 157 N.C. App. 200, 214, 578 S.E.2d 642, 652 (2003) (citing State v. Nesbitt, 133 N.C. App. 420, 426, 515 S.E.2d 503, 407 (1999)).
According to N.C.R. App. P. 10(b)(2), "[a] party may not assign as error any portion of the jury charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly that to which he objects and the grounds of his objection[.]" Because Defendant failed to object to the court's "imperfect self-defense" instructions at trial, we review Defendant's assignment of error under the plain error rule, which requires the "defendant [to] convince this Court not only that there was error, but that absent the error, the jury probably would have reached a different result."[2]State v. Reid, 335 N.C. 647, 667, 440 S.E.2d 776, 787 (1994) (applying the plain error rule to the defendant's argument that the trial court erred by instructing the jury concerning the impact of a lack of provocation by the defendant, instead of the victim, on the jury's ability to infer that the defendant acted with premeditation and deliberation) (citing State v. Jordan, 333 N.C. 431, 440, 426 S.E.2d 692, 697 (1992); State v. Odom, 307 N.C. 655, 300 S.E.2d 375 (1983)). In order to show "plain error," Defendant must demonstrate that any error was so "fundamental" that it caused "a miscarriage of justice[.]" Odom, 307 N.C. at 660, 300 S.E.2d at 378 (citations omitted). "In deciding whether an alleged defect in a jury instruction constitutes `plain error,' the appellate court must examine the entire record and determine if the instructional error had a probable impact on the jury's finding of guilt." Id., 307 N.C. at 661, 300 S.E.2d at 378 (citations omitted).
A defendant acts in "perfect self-defense" if:
(1) it appeared to defendant and he believed it to be necessary to kill the deceased in order to save himself from death or great bodily harm; and
(2) defendant's belief was reasonable in that the circumstances as they appeared to him at that time were sufficient to create such a belief in the mind of a person of ordinary firmness; and
(3) defendant was not the aggressor in bringing on the affray, i.e., he did not aggressively and willingly enter into the fight without legal excuse or provocation; and
(4) defendant did not use excessive force, i.e., did not use more force than was necessary or reasonably appeared to him to be necessary under the circumstances to protect himself from death or great bodily harm.
State v. Lyons, 340 N.C. 646, 661, 459 S.E.2d 770, 778 (1995) (quoting State v. McAvoy, 331 N.C. 583, 595, 417 S.E.2d 489, 497 (1992) (internal quotation omitted)); see also State v. Mize, 316 N.C. 48, 51, 340 S.E.2d 439, 441 (1986). "Perfect self-defense excuses a defendant altogether for a killing if all four elements above exist at the time of the killing." Lyons, 340 N.C. at 661, 459 S.E.2d at 778. "Imperfect self-defense renders a defendant guilty of at least voluntary manslaughter if the first two elements above exist at the time of the killing but the defendant, without murderous intent, either was the aggressor in bringing on the affray or used excessive force." Id. One is the "aggressor" for purposes of the law of "imperfect self-defense" "if he `aggressively and willingly enters into a fight without legal excuse or provocation.'" State v. Potter, 295 N.C. 126, 144, 244 S.E.2d 397, 409 (1978) (quoting State v. Wynn, 278 N.C. 513, 519, 180 S.E.2d 135, 139 (1971)). "A person is considered to be an aggressor under this rule . . . when he has provoked a present difficulty by language or conduct towards another that is calculated and intended to bring it about." Potter, 295 N.C. at 144, ftn. 2, 244 S.E.2d at 409, ftn. 2. Excessive force is "more force than was reasonable under the circumstances[.]" Potts, 334 N.C. at 581, 433 S.E.2d at 739 (1993).
The trial court instructed the jury with respect to the issue of whether Defendant was the "aggressor" or used "excessive force" as follows:
If the defendant voluntarily, without provocation entered the fight, he would be considered the aggressor. One enters a fight voluntarily if he uses toward his opponent abusive language which, considering all the circumstances, is calculated and intended to bring on a fight. A defendant uses excessive force if he uses more force than reasonably appeared to him to be necessary at the time of the killing. . . . The defendant is not entitled to the benefit of self-defense if he was the aggressor with the intent to kill or inflict serious bodily harm upon the deceased.. . . [Y]ou may convict the defendant of voluntary manslaughter if the State proves that the defendant was simply the aggressor without murderous intent in bringing on the fight in which the deceased was killed or that the defendant used excessive force.
Since the trial court's instructions represent an accurate statement of North Carolina law concerning "imperfect self-defense," the only issue that needs to be addressed in order to resolve Defendant's challenge to this portion of the trial court's instructions is the extent to which the record contains evidence that, taken in the light most favorable to the State, tends to show that Defendant was the "aggressor" and used "excessive force."
Although the undisputed record evidence establishes that Eason was older and much larger than Defendant, these size and age disparities, standing alone, do not demonstrate that Defendant was not the "aggressor" or that he did not use "excessive force." Instead, this determination needs to be made on the basis of an analysis of the entire record, which contains sufficient evidence to support both prongs of the trial court's "imperfect self-defense" instruction. Although the undisputed evidence does tend to show that the entire incident began when Eason, Butcher, and Page came to the residence occupied by Defendant and Bates, Butcher stated that "[t]here was no argument at first" and that Eason initially told Defendant, "just tell me where the dog is[;] we are not going to do anything to you, not going to hurt you at all." Furthermore, the evidence also supports an inference that things had somewhat calmed down by the time that Eason, Butcher, and Page were satisfied that the puppy was not in Defendant's and Bates' residence and had decided to go to Bruce's residence. Finally, the undisputed evidence tends to show that Defendant initiated the gunfire that caused Eason's death. According to Page, Defendant "was loudly talking to Eason" just before he fired, and said, "F*** this s***." When asked whether Eason "grab[bed] [Defendant's] shirt by the collar[,]" Page responded, "they won't (sic) even that close to each other." Both Butcher and Page denied hearing Eason threaten physical harm to Defendant or Bates. The record contains no evidence that Eason was actually armed at the time that Defendant shot him, and Page testified that Eason was not reaching for his pocket at the time that the shot was fired. Although the evidence was undoubtedly conflicting and would have supported a range of different verdicts, there was ample basis for a jury finding that Defendant was the "aggressor" and used "excessive force" at the time that Defendant shot Eason.
In reaching this conclusion, we find the opinion of this Court in Rathbone, 78 N.C. App. at 64-65, 336 S.E.2d at 706 (1985), to be instructive. In Rathbone, this Court found "the court's instruction [permitting the jury to find that the defendant was the] `first aggressor' [to be] appropriate" even though the evidence showed that the victim "came in and tried to take over," since the evidence also "support[ed] a reasonable inference that defendant initiated the exchange of gunfire[.]" Id. The Court further stated that:
[E]ven if we were to assume, arguendo, that the evidence was insufficient to warrant the `first aggressor' instruction, any error in giving the instruction could not have had a probable impact on the jury's verdict in view of the evidence supporting defendant's use of excessive force.
Id., 78 N.C. App. at 66, 336 S.E.2d at 707. As a result, the Rathbone Court concluded that the trial court's "aggressor" and "excessive force" instructions had adequate evidentiary support and that, even if the record did not permit a finding that the defendant was the "aggressor," any error in allowing the jury to consider that issue was harmless.[3]
The evidence here has clear similarities to that under consideration in Rathbone. In both cases, the victim initiated the larger incident that resulted in the victim's death. However, as Rathbone makes clear, that fact does not preclude a finding that the defendant acted as the aggressor or used excessive force. In that sense, we see no material distinction between the facts present here and those before the Court in Rathbone and so conclude that the evidence presented at trial supported the trial court's decision to instruct the jury on both components of "imperfect self-defense." As a result, the trial court did not commit error, much less plain error, by allowing the jury to find that Defendant acted in "imperfect self-defense" on the basis that he was either the "aggressor" or used "excessive force."[4]

III. Jury Instruction
In his final argument on appeal, Defendant contends that the trial court committed plain error by failing to instruct the jury that they could determine that Eason's hands were dangerous or deadly weapons in determining whether Defendant acted in "perfect self-defense." After careful consideration of the record evidence and the applicable law, we conclude that the trial court did not err by failing to deliver such an instruction.
As we have already noted, appellate challenges to jury instructions against which no objection was lodged at trial are subject to review under a "plain error" standard. State v. Bagley, 321 N.C. 201, 362 S.E.2d 244 (1987); State v. Cummings, 346 N.C. 291, 488 S.E.2d 550 (1997). In order to constitute "plain error," an instructional error must be so serious that, (1) absent the error, the jury probably would have reached a different verdict or (2) the error would result in a miscarriage of justice if not corrected. State v. Nicholson, 355 N.C. 1, 63, 558 S.E.2d 109, 150 (2002). At bottom, in order to decide whether an instructional error rose to the level of "plain error," the appellate court must examine the entire record and determine if that error had a probable impact on the jury's finding of guilt. Odom, 307 N.C. 655, 300 S.E.2d 375.
At trial, the trial court instructed the jury that it could acquit Defendant on the grounds of "perfect self-defense." However, in discussing the substantive law of self-defense, the trial court did not tell the jury to consider whether Eason's hands were deadly weapons in evaluating the reasonableness of Defendant's belief that he needed to protect himself from death or serious bodily injury or in determining whether he used excessive force. As a result of the fact that the undisputed evidence disclosed that Eason was six feet, six inches tall and weighed 290 pounds and that Defendant was a teenager who was five feet, three inches tall and weighed 115 pounds, Defendant contends that the trial court should have instructed the jury that "hands may be considered deadly weapons, given the manner in which they were used and the relative size and condition of the parties involved," State v. Grumbles, 104 N.C. App. 766, 771, 411 S.E.2d 407, 410 (1991), in discussing whether the jury should have acquitted Defendant on the grounds of "perfect self-defense." As the result of Defendant's failure to request such an instruction or to object to its omission from the trial court's instructions prior to the beginning of the jury's deliberations, our review of Defendant's argument must be conducted under the plain error standard.
The question presented by Defendant has already been addressed by our Supreme Court in State v. Bunning, 338 N.C. 483, 450 S.E.2d 462 (1994), later appeal on other grounds, 346 N.C. 253, 485 S.E.2d 290 (1997). In Bunning, the Supreme Court stated that:
The defendant requested that in charging on self-defense, the court instruct the jury that it could find that the decedent was choking or attempting to choke the defendant and that the decedent's hands were being used as a deadly weapon. The defendant relies on two cases decided by the Court of Appeals which hold that under certain circumstances the hands and fists can be deadly weapons to support convictions of assault with a deadly weapon. State v. Grumbles, 104 N.C. App. 766, 411 S.E.2d 407 (1991); State v. Jacobs, 61 N.C. App. 610, 301 S.E.2d 429 (1983).
The defendant does not otherwise take exception to the charge on self-defense. We must assume that the jury knew that depending on the circumstances a person could kill by choking another person to death. It could have properly determined under the charge given by the court whether the defendant was under such assault as would justify his taking the life of the decedent. It was not necessary to tell the jury that it could find that the decedent's hands were a deadly weapon in order to do so.
Bunning, 338 N.C. at 492-93, 450 S.E.2d at 466. As a result, the Supreme Court held that the trial court did not err by declining to instruct the jury that the victim's hands may be considered deadly weapons for the purpose of determining whether the defendant acted in self-defense. In this case, Defendant did not request the "hands as a deadly weapon" instruction at all, which results in appellate review under the more exacting plain error standard. Given the Supreme Court's decision in Bunning and the trial court's instruction that the jury could consider the "size, age and strength of [Defendant] as compared to [Eason]" in determining whether Defendant acted in self-defense, we conclude that the court's failure to deliver an additional instruction that Eason's hands could be considered deadly weapons did not constitute error, much less plain error.[5]
After careful review of the record in light of the applicable law, we find that Defendant received a fair trial free from prejudicial error. Although the record reveals a sharp conflict in the evidence, it was the task of the jury under our system of criminal jurisprudence to resolve the myriad factual controversies that existed in the trial record under proper instructions from the trial court. Given the absence of any error of law brought to our attention in accordance with the rules of appellate procedure, we have no authority to disturb the trial court's judgment.
NO ERROR.
Judges ELMORE and STROUD concur.
Report per Rule 30(e)
NOTES
[1] Page told investigating officers that he saw Eason reach toward his pocket immediately before the shooting. During his trial testimony, he denied that anything of the sort had actually occurred.
[2] Defendant appears to contend that this issue should not be subject to review under a plain error standard, but rather is subject to de novo review. In essence, Defendant contends that, because he made a timely motion to dismiss for evidentiary insufficiency, he should be deemed to have objected to the trial court's decision to instruct the jury on both of the bases that permit a finding that a particular defendant acted in "imperfect self-defense." This Court has previously applied plain error analysis to a challenge to jury instructions allowing consideration of whether the defendant was the "aggressor" or acted with "excessive force" despite the fact that the defendant had moved to dismiss for evidentiary insufficiency. State v. Rathbone, 78 N.C. App. 58, 64-66, 336 S.E.2d 702, 706-707 (1985), disc. review denied, 316 N.C. 200, 341 S.E.2d 582 (1986). We are bound by Rathbone and reject Defendant's standard of review argument on the basis of that decision.
[3] Although the fact that there was no objection to the relevant instructions at trial meant that the Rathbone Court's ultimate holding was that the trial court's instructions were not infected with plain error, it is clear from the Court's opinion, which states that there was evidentiary support for both prongs of the trial court's instruction, that there was no error, plain or otherwise, in those instructions.
[4] In view of the fact that the trial court did not err, much less commit plain error, by allowing the jury to consider whether Defendant was the "aggressor" or used "excessive force," Defendant's additional argument that his trial counsel failed to provide him with constitutionally adequate representation by failing to preserve this issue for appellate review is also without merit. See State v. Brewton, 173 N.C. App. 323, 333, 618 S.E.2d 850, 858, disc. review denied, 360 N.C. 177, (2005), cert. denied, 636 S.E.2d 812 (2006) (stating that "because we find no error in the instructions, defendant's claim for ineffective assistance of counsel must also be rejected").
[5] Since the trial court did not err by failing to instruct the jury in connection with the issue of whether Defendant acted in self-defense that Eason's hands could be considered deadly weapons, Defendant's additional argument that Defendant's trial counsel provided constitutionally deficient representation by failing to request the delivery of such an instruction fails as well. See Brewton, 173 N.C. App. at 333, 618 S.E.2d at 858 (stating that "because we find no error in the instructions, defendant's claim for ineffective assistance of counsel must also be rejected").