TYSON, Judge.
*364 Antonio Lamar Stimpson ("Defendant") appeals from judgments entered after a jury convicted him of discharging a firearm into an occupied property, discharging a firearm into an occupied vehicle, five counts of conspiracy to commit robbery with a firearm, six counts of robbery with a firearm, and two counts of attempted robbery with a firearm. Defendant has abandoned his appeal on all convictions and judgments, except for four of the five conspiracy convictions. We find no error in any of Defendant's convictions and judgments.
*605 *365 I. Factual Background
A. The Crimes
1. Smith
In the early morning hours of 22 March 2014, Debra Smith left a hair salon on Summit Avenue in Greensboro and entered her vehicle. A dark colored Jeep Cherokee vehicle swiftly pulled up and blocked her from leaving. Ms. Smith testified she saw two men exit the Jeep, with one man carrying a pump shotgun. The men wore masks and dark clothing. Ms. Smith was ordered to exit her vehicle and instructed to "give us your money."
Ms. Smith testified she was "scared for her life" when a gunshot was fired near her head. She fell onto the pavement as she exited from her vehicle. Ms. Smith told the men she did not have any money. One of the men with a shotgun began to taunt her. The other man stated, "Come on, man, take the vehicle" and the men got into Ms. Smith's car and drove it away.
2. Eban and Nie
On the same morning at about 5:45 a.m., Kler Eban was watching from the front door of his home on Sunrise Valley Road in Greensboro, as his wife walked to her car to leave for work. He saw three men walk past his house. Mr. Eban testified the men returned and two went behind his wife's car and one came toward the door of his house and shouted at him to open the door. Mr. Eban testified the men's faces were covered. One of the men pointed a gun wrapped in cloth at Mr. Eban.
Mr. Eban heard a gunshot and attempted to get out of the door to assist his wife. Mr. Eban's wife, Lieu Nie, testified a red Jeep was parked behind her car. The men had shot at her through the driver's side window while she was sitting in the driver's seat.
Two shots were also fired in Mr. Eban's direction. Ms. Nie crawled over the front seat and escaped through the rear door. The robbers entered Ms. Nie's car and stole a shopping bag of new cooking utensils. Mr. Eban testified one of the men got into the Jeep and two of them got into his wife's car and drove it away.
3. Nareau
Around 6:30 a.m., John Nareau drove his car into a parking space at his workplace on Norwalk Street in Greensboro. As he exited his vehicle, a male got in front of him and raised what appeared to be a *366 sawed-off shot gun. Mr. Nareau was told "don't try anything. There's two in the back." Mr. Nareau testified the man wore a mask and demanded his wallet and cellphone. After handing over his wallet and phone, Mr. Nareau ran away and watched the men get into a dark colored Jeep and drive away.
4. Tomlin, White, Wilkerson, and Mork
At a little before 7:00 a.m. on the same date, four friends, Elizabeth Tomlin, Brinson White, Clair Wilkerson and Wesley Mork, were loading luggage in the trunk of their rental car, when three men yelled at them "to turn around, mother f-ker;" and "get down mother f-ker." Ms. Tomlin saw the men exit from a red Jeep parked 30-40 feet away. The men wore masks and dark clothing and carried guns. One of the guns appeared to be a sawed-off shotgun. The two women were chased by one man, while Mr. Carter and Mr. Mork were detained on the ground by the other two men from the Jeep. Mr. Mork's wallet and cash were stolen and cash was stolen from Mr. Carter.
During the pursuit, Ms. Tomlin's and Ms. Wilkerson's bags were taken. One of the attackers yelled "get in the car and take the car." The keys to the rental car were not in the vehicle, so all three men ran back to the Jeep and left.
5. Holland
Nicholas Holland was the final victim of the related crimes that occurred that morning. As Mr. Holland left his residence on Tremont Street in Greensboro, he noticed two males walk past the house. Mr. Holland observed a Jeep vehicle quickly pull up in front of his house. A masked male with a handgun demanded, "Give me what you have." Mr. Holland offered his brief case and car keys and attempted to run away. One of the men chased him until the same Jeep pulled up and the man climbed inside. The Jeep sped away.
*606 B. Investigations
In response to the robberies, Greensboro Police Detective Devin Allis received a dispatch with a description of the dark colored Jeep Cherokee being involved. Detective Allis pursued the Jeep and apprehended the driver, Aaron Spivey, after a chase. Mr. Spivey was arrested with Mr. Mork's wallet in his possession.
After Spivey's arrest, officers located Defendant and LeMarcus McKinnon walking in a nearby area. Defendant and McKinnon ran as the officers approached and had identified themselves. Defendant was *367 apprehended by Lieutenant Larry Patterson. When arrested, Defendant was wearing a dark colored T-shirt, dark blue jeans and grey sneakers. He had cash, Mr. Nareau's cellphone and the keys to Ms. Nie's car in his possession.
When interviewed by police, Defendant initially denied any involvement in the robberies. Eventually Defendant admitted he had been present in the dark Jeep Cherokee with Spivey and McKinnon. Defendant stated he and McKinnon were cousins and were "tight." Defendant acknowledged he had met Spivey the previous week. Defendant also told police he had handled one of the guns a few days before the robberies.
Defendant told police officers he had been a passenger in the Jeep and witnessed the robberies perpetrated by the others. Defendant admitted driving the Jeep from the scene of the robbery of Ms. Nie and to later meeting Spivey and McKinnon for the subsequent robberies.
Officers recovered three pair of gloves, a blue toboggan, a black and grey bandana and a black headband or neckwarmer from inside the passenger area of the Jeep Cherokee. The handbags and briefcase belonging to the various victims were also recovered from inside the Jeep.
II. Jurisdiction
Jurisdiction lies in this Court pursuant to N.C. Gen. Stat. § 7A-27(b) (2015) and N.C. Gen. Stat. § 15A-1444(a) (2015).
III. Issue
Defendant asserts the trial court erred by failing to dismiss four of the conspiracy charges and argues the State's evidence supported only a single charge.
IV. Standard of Review
"We review the trial court's denial of a motion to dismiss de novo ." State v. Sanders , 208 N.C. App. 142, 144, 701 S.E.2d 380, 382 (2010). Under a de novo standard of review, this Court "considers the matter anew and freely substitutes its own judgment for that of the trial court." Id .
In ruling on a motion to dismiss for insufficiency of the evidence,
the trial court must consider the evidence in the light most favorable to the State, drawing all reasonable inferences in the State's favor. All evidence, competent or incompetent, must be considered. Any contradictions or conflicts in the evidence are resolved in favor of the State, and evidence unfavorable to the State is not considered....
*368 [S]o long as the evidence supports a reasonable inference of the defendant's guilt, a motion to dismiss is properly denied even though the evidence also permits a reasonable inference of the defendant's innocence. The test for sufficiency of the evidence is the same whether the evidence is direct, circumstantial or both.
State v. Bradshaw , 366 N.C. 90, 92-93, 728 S.E.2d 345, 347 (2012) (emphasis supplied) (internal citations and quotation marks omitted).
V. Analysis
A. State's evidence
"A criminal conspiracy is an agreement between two or more persons to do an unlawful act...." State v. Massey , 76 N.C. App. 660, 661, 334 S.E.2d 71, 72 (1985). The agreement to commit the unlawful act may be established by circumstantial evidence. State v. Brewton , 173 N.C. App. 323, 327-28, 618 S.E.2d 850, 854-55 (2005).
A conspiracy ordinarily "ends with the attainment of its criminal objectives...." State v. Tirado , 358 N.C. 551, 577, 599 S.E.2d 515, 533 (2004), cert. denied sub nom, Queen v. N.C. , 544 U.S. 909, 125 S.Ct. 1600, 161 L.Ed.2d 285 (2005) (citation omitted). "The question of whether multiple *607 agreements constitute a single conspiracy or multiple conspiracies is a question of fact for the jury." Id. (citation omitted).
The State alleged Defendant, Mr. Spivey and Mr. McKinnon conspired to commit the robberies of Ms. Smith, Ms. Lie, Mr. Nareau, Ms. Tomlin, Ms. Wilkerson, Mr. Mork and Mr. Holland. The State proceeded on five indictments alleging each incident as a separate conspiracy. The State did not offer the testimony of Spivey or McKinnon, Defendant's alleged co-conspirators. The only witnesses called by the State were the victims of the robberies and the police officers involved in the investigation of the crimes.
We all agree the evidence supports the conclusion that Defendant, Spivey and McKinnon conspired to commit the robberies. The State's evidence showed Defendant and his compatriots were all wearing dark clothing. Implements indicating planning in advance and to assist committing robberies were recovered from inside the Jeep: head and face coverings, gloves, and weapons.
Defendant testified concerning his relationship with McKinnon, his cousin, and that he had met Spivey the week prior to the crimes, and had handled a shotgun used in the robberies a few days before the *369 robberies and admitted being present inside the Jeep Cherokee when the crimes occurred. All three men had been together on the afternoon of 21 March 2014. Defendant testified he, Spivey and McKinnon had been drinking and taking drugs together during the evening before and into the morning of the robberies and that all three men had headed out and traveled together in the early morning hours in the Jeep.
B. Single Conspiracy Cases
Defendant argues all of the above facts present only evidence of a single conspiracy to commit robberies on the morning of 22 March 2014. Defendant asserts State v. Medlin, 86 N.C. App. 114, 357 S.E.2d 174 (1987) and the cases which follow it, control the outcome of his case. See State v. Fink , 92 N.C. App. 523, 375 S.E.2d 303 (1989) ; State v. Wilson , 106 N.C. App. 342, 416 S.E.2d 603 (1992) and State v. Griffin , 112 N.C. App. 838, 437 S.E.2d 390 (1993). We address each in turn.
1. State v. Medlin
In Medlin , the defendant and two others were charged with break-ins and thefts of seven retail stores over the period of four months. Medlin, 86 N.C. App. at 115, 357 S.E.2d at 175. Defendant-Medlin operated a thrift store where co-conspirators Cox and Williams would "hang out." Id. at 118, 357 S.E.2d at 177. Cox and Williams testified the break-ins were Medlin's idea. The State's evidence showed all the break-ins occurred in essentially the same manner: Cox and Williams would break a store window, climb through the hole and carry away items. The defendant would drive his truck to the stores to assist the others in carrying away the stolen goods. The participants met after the break-ins to divide the stolen items and to discuss the next break-in. Id. at 122, 357 S.E.2d at 179. For each of the break-ins, the defendant was charged and convicted under separate indictments for conspiring with Cox and Williams to commit the ten felonious break-ins. Id. at 121, 357 S.E.2d at 178.
This Court recognized "[w]hen the evidence shows a series of agreements or acts constituting a single conspiracy, a defendant cannot be prosecuted on multiple conspiracy indictments consistent with the constitutional prohibition against double jeopardy." Id. (emphasis in original) (citing United States v. Kissel , 218 U.S. 601, 31 S.Ct. 124, 54 L.Ed. 1168 (1910) ). While the offense "is complete upon the formation of the unlawful agreement, the offense continues until the conspiracy comes to fruition...." Id . at 122, 357 S.E.2d at 179.
While there is no simple test for determining whether there was one conspiracy or multiple conspiracies, the Court acknowledged several *370 factors impact the determination of the number of conspiracies, including: "time intervals, participants, objectives, and number of meetings." Id. ; see also Tirado , 358 N.C. at 577, 599 S.E.2d at 533 ("The nature of the agreement or agreements, the objectives of the conspiracies, the time interval between them, the number of participants, and the number of meetings are all factors that may be considered."). *608 2. State v. Fink
In Fink , the conspiracies charged had occurred within hours of each other. Fink , 92 N.C. App. at 533, 375 S.E.2d at 309. The participants in the first conspiracy alleged were the defendant-Fink, his brothers, and one of their "select" customers; the participants in the second conspiracy alleged were Fink and his brothers. Id. A panel of this Court found that while "the amount of cocaine varied in the first and second alleged conspiracies, the objective was the same: to traffic in cocaine." Id. Furthermore at trial, the State argued "there was a 'continuing conspiracy ' among the defendants." Id. This Court recognized a single conspiracy is not necessarily "transformed into multiple conspiracies simply because ... the same acts in furtherance of it occur over a period of time." Id. at 532, 375 S.E.2d at 309. The Court in Fink held evidence showed there was only one "mutual, implied understanding among the brothers to commit the unlawful act of trafficking in cocaine." Id. at 530, 375 S.E.2d at 308.
3. State v. Wilson
In State v. Wilson , 106 N.C. App. 342, 344, 416 S.E.2d 603, 604 (1992), "a series of robberies occurred in and around Durham during a two week period in December 1988." One of the participants in the robberies in Wilson was a witness for the State. He testified that a few days before their first robbery, "defendant told him that cash money ... was what it was all about and the onliest [sic] way to get cash money was in armed robberies." Id. at 346, 416 S.E.2d at 605. The co-conspirator also testified that once they started committing the robberies, the men did not want to stop "robbing places." Id.
This Court found the facts of Wilson "to be legally indistinguishable from Medlin " and stated, "evidence that a common scheme of a single conspiracy to commit armed robberies to acquire cash existed." Id. at 346, 416 S.E.2d at 605.
4. State v. Griffin
This Court also reached a similar conclusion in State v. Griffin , 112 N.C. App. 838, 437 S.E.2d 390 (1993). In Griffin , the State failed to *371 prove more than one conspiracy, where the offenses occurred over a one month period, the indictments alleged the defendant had conspired with the same participants for each conspiracy count and with the same objective. Id . at 841, 437 S.E.2d at 392.
Furthermore, "the State presented no evidence concerning the number of meetings which took place between [the] defendant and the other participants." Id. "[W]hen the State elects to charge separate conspiracies, it must prove not only the existence of at least two agreements, but also that they were separate." Id . at 840, 437 S.E.2d at 392 ; see also State v. Rozier , 69 N.C. App. 38, 52, 316 S.E.2d 893, 902 (vacating defendant's additional conspiracy counts where multiple overt acts arising from a single agreement to sell large amounts of cocaine do not permit prosecutions for multiple conspiracies), cert. denied , 312 N.C. 88, 321 S.E.2d 907 (1984).
Here, Defendant argues none of the other perpetrators testified at trial and the State offered no direct evidence of any planning or conversations before or between each event. The State offered no testimony concerning any discussions between the co-participants before, during or after each robbery. Defendant argues the State's evidence was sufficient to allow the jury to infer only a single conspiracy had occurred based upon the implements found in the Jeep, the victims' belongings found on all of the culprits, and Defendant's own statements that he had met up with the co-conspirators before their crime spree began. We disagree.
C. Multiple Conspiracies
The State asserts the facts before us are distinguishable from the line of cases above. Unlike the facts in State v. Medlin, no evidence shows any meeting took place between Defendant and the other two robbers subsequent to any of the robberies to plan additional robberies in furtherance of any prior agreement to engage in as many crimes as possible, only that the three men were drinking and doing drugs together the evening and morning before the crimes were committed. There was no evidence that the Defendant and his co-conspirators conspired to engage in as many robberies as they could. They agreed and engaged in random *609 robberies as the opportunities appeared before them.
The dissenting judge asserts the State "impliedly" admits it did not prove five separate agreements. We disagree. On brief, the State acknowledges there was no proof of any meeting about or discussion between Defendant and the other perpetrators to plan to commit a series of robberies . Evidence was offered by the State and by Defendant of *372 meetings and interactions with Defendant and the other conspirators, before and between each robbery, but no evidence of the conversations.
The facts in Wilson are also dissimilar to the instant case. No evidence shows any meeting being held between Defendant and the other robbers prior to the robberies to discuss or plan the robberies, or the specific property to be stolen during the course of the robberies. Unlike the facts in Fink and Griffin , there is no evidence of a meeting between Defendant and the other two perpetrators to devise a single plan to engage in a series of robberies.
The dissent finds Defendant's case to be most similar to Medlin . However the State's evidence showed defendant-Medlin initiated the idea and suggested to his co-conspirators the plan to break in and steal the televisions and radios that he could sell in his thrift store. Medlin , 86 N.C. App. at 119, 357 S.E.2d at 177. The multiple break-ins were part of a single plan to steal merchandise to be sold at Medlin's thrift store. Id. at 122, 357 S.E.2d at 179. Here, the crimes were ones of opportunity, where differing victims were accosted and items were stolen from them as Defendant and his co-conspirators happened to come upon them.
No evidence limits Defendant as engaged in a one-time, pre-planned and organized, ongoing and continuing conspiracy to engage in robbery and the other crimes. In particular, the random nature and happenstance of the robberies and related crimes here do not indicate a one-time, pre-planned conspiracy. The victims and property stolen were not connected. The victims and crimes committed arose at random and by pure opportunity. Each of the series of crimes on the various victims was committed and completed before Defendant and his co-conspirators moved on and happened upon and mutually agreed to rob and commit other crimes on their next targets and victims of opportunity. Defendant's argument is overruled.
1. State v. Roberts
In State v. Roberts , 176 N.C. App. 159, 625 S.E.2d 846 (2006), the defendant was convicted of two counts of conspiring to commit first degree burglary and robbery with a dangerous weapon for burglaries and robberies which occurred on two consecutive nights. On the first night, the defendant and others discussed "robbing someone." Id. at 161, 625 S.E.2d at 848. The conspirators then burglarized and robbed two separate victims. Id. On the second night, the defendant took an active part in another burglary and robbery of different victims, but there was no testimony that the agreement of the first night covered the acts of the second. Id.
*373 This Court determined the State had shown separate conspiracies where the defendant and two men agreed to rob someone and nothing else showed subsequent similar criminal acts were committed as part of their initial agreement. Id . at 167, 625 S.E.2d at 852. Viewed in the light most favorable to the State, sufficient evidence was presented to allow the jury to find the defendant was involved in two separate conspiracies. Id.
2. State v. Glisson
A recent case before this Court addressed the defendant's argument that he had engaged in a single conspiracy to complete three separate transactions. State v. Glisson , --- N.C. App. ----, 796 S.E.2d 124 (2017). In Glisson , the defendant sold oxycodone to an undercover police officer in three separate controlled drug transactions with each transaction being a month or more apart. Id. at ----, 796 S.E.2d at 126. No evidence was offered to suggest that the defendant planned the transactions as a series. An informant or the police initiated each sale. Id. at ----, 796 S.E.2d at 129.
This Court held "evidence was sufficient to support a reasonable inference that the defendant planned each transaction in response to separate, individual requests by the buyers...." Id. "While the objectives of each *610 [crime] may have been similar, the agreed upon amount differed and none of the transactions contemplated future transactions." Id.
Considering the totality of the circumstances in the present case, and reviewing the evidence in the light most favorable to the State, sufficient evidence supports a reasonable inference for the jury to consider and conclude that Defendant was involved in five separate conspiracies to commit armed robbery.
While the dissenting opinion sets forth our same standard of review on motions to dismiss, it appears to ignore its application to the motion to dismiss in the case before us. "In 'borderline' or close cases, our courts have consistently expressed a preference for submitting issues to the jury, both in reliance on the common sense and fairness of the twelve and to avoid unnecessary appeals." State v. Hamilton , 77 N.C. App. 506, 512, 335 S.E.2d 506, 510 (1985) (citations omitted) review denied , 315 N.C. 593, 341 S.E.2d 33 (1986). "The question of whether multiple agreements constitute a single conspiracy or multiple conspiracies is a question of fact for the jury." Tirado, N.C. App. at 577, 599 S.E.2d at 533 (citation omitted). The trial court did not err by denying Defendant's motion to dismiss and properly submitted all five conspiracy counts to the jury.
*374 VI. Conclusion
In a motion to dismiss, the trial court must consider the evidence of multiple conspiracies in the light most favorable to the State and give the State every reasonable inference to be draw from the evidence presented. Bradshaw , 366 N.C. at 92-93, 728 S.E.2d at 347. We find no error in Defendant's convictions or the judgments entered thereon. It is so ordered.
NO ERROR.
Judge STROUD concurs.
Judge ELMORE dissents with separate opinion.